# TEVIS *v.* HAMMERSMITH ET AL.

[No. 21,254. Filed April 10, 1908.]

1. TRIAL.—*Special Findings.—Request for.—Withdrawal.—Exception by Adverse Parties.*—The withdrawal, just before the decision is announced, of a request for a special finding, cannot be made the basis of any objection by the adverse parties, though they were relying thereon. p. 288.

2. SAME.—*Special Findings.—Request for.—Time of.*—Requests for special findings must be granted, where made before the beginning of the trial; but in the discretion of the court may be refused, if made later. p. 289.

3. SAME.—*Action of Trial Court.—Presumptions.*—The presumption in favor of the rightfulness of the action of the trial court is strong. p. 290.

4. APPEAL.—*Evidence.—Consideration of.—Intendments.*—The Supreme Court, in the consideration of the evidence in a case on appeal, will make all legal intendments in favor of the finding of the trial court. p. 290.

5. SALES. — *Corporations. — Officers. — Refunding Money Received Personally.—Evidence.*—Where there was evidence tending to show that a director of a water-works corporation agreed with the other directors that he would float the bonds thereof, and construct the plant, and divide profits when it was completed, and he personally contracted for certain pipe, paying his money therefor, whereupon the company became defunct; and he assigned such pipe contract, he cannot be compelled to refund to such corporation the money received for such pipe. p. 290.

6. APPEAL.—*Weighing Evidence.*—The Supreme Court will not weigh conflicting evidence. p. 294.

7. LACHES.—*Corporations.*—*Recovery of Property.*—Where the directors of a corporation, knowing of the sale and assignment of a contract belonging to such corporation, but which defendant paid for out of his private funds, and claimed as his own, remained silent for nine months thereafter, the corporation is guilty of laches precluding a recovery. p. 295.

8. PLEADING.—*Answers.*—*Denial.*—*Confession and Avoidance.*—An answer, by an individual, confessing that defendant' corporation owned the iron pipe—the subject-matter of the litigation—is not an admission of such ownership, where the general denial was also filed, the court finding that defendant owned such pipe personally. p. 296.

9. CORPORATIONS. — *Laches.*—*Stockholders.*—*Rights of.*—Where a corporation has been guilty of laches precluding a recovery by it, its stockholders have no standing to recover on its behalf. p. 296.

10. ACCOUNT. — *Corporations.* — *Officers.* — Interested persons may compel an officer of a corporation, who has transacted business affecting their rights, to account. p. 296.

From Washington Circuit Court; *Perry E. Bear*, Special Judge.

Suit by John Tevis against Louis Hammersmith and others. From a decree for defendants, plaintiff appeals. Transferred from Appellate Court under cl. 2, §1394 Burns 1908, Acts 1901, p. 565, §10. *Affirmed.*

*Helm Bruce, Joseph H. Shea, Mitchell & Mitchell* and *Wood & Jones*, for appellant.

*Clarence Dallam* and *George H. Hester*, for appellees.

GILLETT, J.—This is a second appeal. See *Tevis v. Hammersmith* (1903), 31 Ind. App. 281. The suit was brought by appellant on behalf of the Home Crystal Water Company, to recover the value of a certain lot of iron water-pipe sold by appellee Peter Arlund, the president of said company. The purchasers, whom appellant's brief states are the real defendants in said case, were appellees Gheens, Bush and Parker.

The first question arises out of the refusal of the trial

court to make a special finding. The cause was tried at the June term, 1905, of the court below, and at the commencement of the trial counsel for appellees requested the court to make a special finding, and throughout the trial the court took notes of the evidence for the purpose of complying with said request. Upon the termination of the hearing the judge announced that when he had reached a conclusion he would notify counsel on one side to prepare a special finding. Early in September the judge notified counsel for appellant that he had reached a conclusion, and that he had requested opposite counsel to prepare a special finding. It was the understanding of counsel for appellant, as early as September 6 or 7, that the finding would be favorable to appellees. At about this time counsel for appellees received information that the case would be decided in their favor, and they sent the judge a motion to withdraw their request for a special finding. The latter returned the same to counsel for appellees, and on September 8 they filed it with the clerk of the court below, where it remained until September 27, when it was temporarily withdrawn with the other papers in the case, and thus remained off the files until the day the cause was decided. Counsel for appellant had no notice until October 25 of the withdrawal of the request for a special finding, which was the day set by the judge for deciding the case. They testified that they were misled by their lack of such knowledge, and would have filed a request for a special finding had they known that the request before made had been withdrawn. On the date last mentioned they objected to the withdrawal of such request, and, before the announcement of the decision, requested, on behalf of appellant, that a special finding be filed, supporting their objection and motion by a verified showing. The court, however, refused to make a special finding, and entered a general finding in favor of appellees, to which action appellant excepted.

Section 577 Burns 1908, §551 R. S. 1881, provides: "Upon trials of questions of fact by the court, it shall not

be necessary for the court to state its finding, except generally for the plaintiff or defendant, unless one of the parties request it, with a view of excepting to the decision of the court upon the questions of law involved in the trial; in which case the court shall first state the facts in writing, and then the conclusions of law upon them, and judgment shall be entered accordingly." Although the statute does not fix the time when the request must be made, yet,

2. where not made at the commencement of the trial, this court has held that it is within the discretion of the court to refuse the request. *Hartlep* v. *Cole* (1889), 120 Ind. 247; *Stumph* v. *Miller* (1895), 142 Ind. 442. In *Bingham* v. *Stage* (1890), 123 Ind. 281, 287, this court said: "The court committed no error in refusing to make a special finding that was available to the appellant. The appellant at no time requested the court to make a special finding, and cannot predicate error upon the request of his adversary." If we were to grant appellant's contention (which we are not to be understood as impliedly holding), that a case might be made wherein it might be shown that the court had abused its discretion in refusing to make a special finding pursuant to a request made subsequent to the commencement of the trial, yet it would be enough to dispose of this case to say that there is nothing to show that the court in this instance abused its discretion. Counsel for appellant had no right to rely to any extent whatever upon the fact that their adversaries had asked for a special finding. Appellant was therefore in the position of having, without legal excuse, delayed his request until the day set for the entering of the finding. The special judge, who resided elsewhere, had attended upon court on that day for the purpose of entering a finding, and counsel were also present for the purpose of protecting the rights of their respective clients. To have made a special finding upon request made at that time would have necessarily involved a

considerable delay, as the evidence was long and the preparation of a special finding a difficult task. Besides, we are not advised that the judge had his notes of the evidence with him, or, indeed, whether they had been preserved, for the defendant's request had been withdrawn. The presumption is strong of the rightfulness of the action of the court, and upon the state of the record as indicated in the transcript we can by no means say that the court abused its discretion in denying this eleventh-hour application for a special finding.

In passing on the evidence we must do so with the intendment in favor of the trial court's finding, so far as legally warranted by the evidence. In the year 1898, Peter Arlund obtained a contract for the building of a water-works system in the city of New Albany. This contract was assigned on September 29, 1898, to the Home Crystal Water Company, in consideration of $150,-000 of the company's $200,000 of stock. Arlund was elected·president of the corporation, and as such the by-laws gave him a "general supervision" of its affairs. The other stockholders had comparatively small holdings, but Arlund had executed contracts to others, including appellant, which, if not amounting to executory assignments of stock, were at least a charge upon a considerable portion of his interest. An issue of bonds was authorized on said day to the amount of $150,000, $100,000 of which was to be certified by the trustee and delivered to the water company to erect and complete the plant, and the balance was also to be certified and delivered to the corporation. The company was practically without ready means, and substantially nothing was done in carrying out the work. Referring now to the actual stockholders, it may be said that it was expected to make a profit out of the bonds, and every one who had any connection with the enterprise, or who had put any money into the company, was to receive a profit. The talk was that Arlund and Frank Scheffold were to ·build the

water-works as a construction company, that Arlund should manage the whole affair, should float the bonds, etc., and that after the completion of the work he should render a. statement and divide with the others. Arlund, in the name of the Home Crystal Water Company, invited bids for the furnishing of pipe, and on October 10, 1898, the American Pipe & Foundry Company submitted a bid of $14.50 per ton, addressed to Arlund & Company, "terms to be made satisfactory" to bidder before shipments begin. On said day three of the persons who held office as directors of the Home Crystal Water Company met Arlund and the representative of the American Pipe & Foundry Company in Arlund's office in Louisville. One of the directors testified that the meeting was a called meeting of the directors, and that the members there present authorized Arlund to buy the pipe for the company; that he spoke of the bargain "we had made;" and that he represented to the witness that it was the Home Crystal Water Company which was the purchaser. At this point, however, we quote from Arlund's examination as a witness: "Q. Do you know anything about a committee of the Home Crystal Water Company that was appointed to ascertain about the construction of the plant? A. No, sir; only that Mr. Bir, Mr. Borgerding and Mr. Scheffold came to my office the day I bought the pipe from the American Pipe & Foundry Company. Q. Did they come to your office to attend a meeting of the Home Crystal Water Company? A. No, sir. Q. Were any other directors of that company there? A. Only Messrs. Bir, Scheffold and Borgerding. Q. Tell whether it was in that conversation or on that day that you did make the purchase of the pipe. A. Yes, sir; from the American Pipe & Foundry Company. Q. State whether or not it is a fact that you made that contract with the American Pipe & Foundry Company, or whether you made it independently and separately as the firm of P. Arlund & Company? A. I had no cause to make a contract in the name of the Home.

Crystal Water Company, but in the name of P. Arlund &
Company, for the benefit of the Home Crystal Water Com-
pany. Q. What do you mean when you say that it was
for the benefit of the Home Crystal Water Company, when
you as P. Arlund & Company made the contract for the
purchase of this pipe? A. My contract for the pipe and
the profits would go to the stockholders who were interested
with me, and the people who had put up money with me
were to get the benefit of the profits; the profits I could make
out of the contract. Q. The stockholders who were inter-
ested with you in the Home Crystal Water Company? How
many were in the construction company, if you know?
A. I knew that every individual member who put money
in the Home Crystal Water Company was to share in the
profits I should get from the constructing of that water-
works plant. I bought the pipe for that purpose, with that
intention. Q. State whether you were ever authorized to
purchase this pipe by the Home Crystal Water Company, or
board of directors, or stockholders? A. No, sir; only they
talked for me to go ahead." When asked whether he had
ever told Mr. Bir (as the latter had testified) that the Home
Crystal Water Company owned the pipe, the witness an-
swered: "No, sir-ee." It must be confessed that there is
difficulty in reconciling the claim of Arlund that the pipe
was purchased by him with his correspondence with the
American Pipe & Foundry Company, but, on the other
hand, we find that at a meeting of the directors of the cor-
poration, held January 24, 1899, at which all but one of the
directors were present, it was unanimously resolved that ·a
committee of three should be appointed to advertise for bids
"for furnishing and constructing the water-works plant,"
and thereupon a committee was appointed to advertise "for
said construction and completion of said plant." Shortly
afterwards it was ascertained that the bonds could not be
sold, owing to some defects in the franchise, and, aside from
an effort to secure the passage of an amendatory ordinance,

the corporation seems with this to have become practically defunct. Arlund made unsuccessful efforts to borrow money on the pipe contract, and in the latter part of February, 1899, he assigned the contract to Gheens, Bush and Parker. One of their number interrogated him as to his title, and he stated that the company had no interest in the pipe. The attorney of Arlund, who had prepared the articles of incorporation and the mortgage, and had been present at all of the meetings of the stockholders and directors, as shown by the minute books, was interrogated by one of the purchasers as to whether the corporation had anything to do with the contract, and to this question the attorney, according to his testimony, made answer: "I told him the Home Crystal Water Company at its meeting a month previous passed a resolution appointing a committee to advertise for bids for constructing and building a plant; that it had never been at any time the intention of the company, outlined at any of its meetings, or any of its officers, to buy the material and build a plant of its own, but that they relied upon the plant's being constructed and upon paying for it in bonds, and possibly some stock; that they had up to that time never received, that I had ever heard of, any bid for the construction of that plant. In conversation with Arlund frequently I knew that he had expected to bid on the contract, and that he had gotten this bid for pipe to enable him to put in a bid, but the failure of the Chicago people to take the bonds, and the failure of the new ordinance, destroyed, in my opinion, any question of building the plant, and it was never seriously considered after that." There was a sharp increase in the price of iron-pipe after the making of the contract, and the purchasers were able, by advancing a large amount of money and by much effort, to sell the pipe at a considerable advance. The drafts were drawn on P. Arlund, president of the Home Crystal Water Company. It was explained that this was because the pipe company showed a disposition to endeavor to get out of the con-

tract. Two of the directors, at least, had to do with the dealings of the purchasers, and we find no evidence of any effort upon the part of any of the stockholders or directors to undo Arlund's action until this suit was commenced, abount nine months after the sale. Appellant claims to have learned of what had been done late in the summer of 1899. So far as we have observed, the evidence does not show that he had had anything to do with the transaction of the business of the company, or was advised thereof. These facts, however, are not really influential. Between said time and the bringing of the suit appellant was active in the effort to acquire stock in the corporation and the other interests, with a view to the making of his interests profitable by the setting aside of the sale.

We are unable to say that the finding of the court was not authorized, in view of the state of the record. There is enough of contradiction in the evidence to prevent a review by this court. *Hudelson* v. *Hudelson* (1905), 164 Ind. 694, and cases cited. Arlund's testimony was not as perspicuous as it might have been concerning his acceptance of the bid in his individual capacity, but it is clear that it was his purpose to have the court so understand. In this he is borne out by the fact that until this suit was brought those concerned are not shown to have offered any objection to what he did, and that none of the stockholders or directors are shown to have taken any steps to take care of the contract. It is also strongly corroborated by the fact that as late as January 4, 1899, the corporation was taking steps to procure a contractor to furnish material and construct the plant, a course which it would not have taken had it been supposed that the company had purchased about 3,000 tons of pipe which would involve an expenditure of upwards of $40,000. Arlund seems to have dominated in the entire undertaking, but there is abundant room for the conclusion that the expectation of the stockholders and directors was that through Arlund, acting as a contractor or

construction company, they would all receive profits upon his final accounting with them.   This being true, whatever Arlund's responsibility to the corporation may be for the profits he derived from the sale of the pipe, it cannot be said that if he bought the pipe in his individual capacity he was without authority to sell it.   The corporation was a separate entity, and after he had been given *carte blanche* to go ahead as a construction company, with only the responsibility of ultimately accounting to the stockholders and persons concerned, the corporation, which never put itself in privity with this contract while there was any burden to bear, cannot, after he has sold what he had the legal title to, and after the purchasers, by their money and endeavor, have made the bargain good, step in and claim the whole benefit.   This would not be justice.   It would be iniquitous.   The court was legally justified in concluding that Arlund owned the pipe, or rather the contract therefor, and, this being true, whatever notice the purchasers may have had of his relations with the company, it was too late for the corporation and for those concerned with it, having omitted to interest themselves in the transaction when money was required to make the contract of any value, to complain of the disposition which Arlund made of the contract.   Appellant, at the most, has shown but a mere irregularity, and as the

7.   company, the stockholders and the directors have been guilty of great laches since, it has no enforceable equity which is available to it or to appellant.   This alone is enough to dispose of the case.   *Hill* v. *Nisbet* (1885), 100 Ind. 341, 355; 10 Cyc. Law and Proc., 970.   It was said in *Moran* v. *Horsky* (1900), 178 U. S. 205, 208, 20 Sup. Ct. 856, 44 L. Ed. 1038, that a neglected right, if neglected too long, must be treated as an abandoned right which no court will enforce.   The corporation is without equity, and appellant's claim in this case is derived from the company.

It is true that a special paragraph of answer contained an admission that the company had purchased the pipe, but

this did not overcome the force of the general denial.

8. *Fudge* v. *Marquell* (1905), 164 Ind. 447; *Ray* v. *Moore* (1900), 24 Ind. App. 480.

It is unnecessary to determine the precise relation of appellant to the corporation. If the latter ought in morals and justice to be bound by what was done, and we

9. hold that it should be, then appellant must, for the purposes of this action, stand in its shoes.

There could be no objection to an action by the parties in interest to require Arlund to account for the money received by him from the sale of the contract, but we

10. perceive no ground, in view of the points made, for disturbing the finding of the court below.

Judgment affirmed.