# SINCLAIR ET AL. *v.* GUNZENHAUSER ET. AL.

[No. 21,728.  Filed March 27, 1912.  Rehearing denied January 10, 1913.]

1. CONSTITUTIONAL LAW.—*Application of Constitutional Provisions.*—The provisions of the fifth amendment to the Constitution of the United States operate exclusively in restriction of federal power, and have no application to the legislation of the states, or the administration of state laws. p. 110.
2. JUDGMENT.—*Collateral Attack.*—*Jurisdiction.*—*Presumptions.*—*Service of Summons Outside State.*—Although statutory provisions for the service of summons outside the State must be strictly followed in order to confer jurisdiction, where the record of a judgment in a foreclosure suit shows an affidavit of service on defendants outside the State, but does not show that an affidavit of nonresidence had been filed, that there was an order for publication or service of summons outside the State, nor that the affidavit of the service was accompanied by a certificate of the official character of the notary before whom the affidavit was made, it will be presumed in a collateral preceeding that all necessary facts were found to exist and that the court had jurisdiction of the defendants. pp. 110, 138, 139.
3. TRUSTS.—*Conveyance by Beneficiary.*—*Effect.*—Where two purchasers of land caused the conveyance to be made to a third party, and thereafter on the request of one only of the purchasers the third party executed a deed for the land to a trustee, and nothing was paid for such conveyance either by the trustee or by the *cestuis que trustent*, neither such trustee nor the *cestuis que trustent* were good faith purchasers, and where the other of the two original purchasers subsequently conveyed his undivided one-half interest in the land, he at least transferred an equitable right by such conveyance, if not the legal title, so that persons thereafter claiming under such trustee and seeking to assert

Sinclair *v.* Gunzenhauser—179 Ind. 78.

title as against the purchaser at a foreclosure sale, would have no claim to more than one-half of the land, even if the foreclosure proceeding was void as to them. p. 113.

4.   Vendor and Purchaser.—*Record of Deeds.—Notice.—Deed Not in Chain of Title.*—The record of a deed from a stranger to the title, is not constructive notice to purchasers in good faith. p. 115.

5.   Vendor and Purchaser.—*Record of Deeds.—Recording Deed in Miscellaneous Record.—Notice.*—Section 949 Burns 1908, §915 R. S. 1881, requires deeds to be recorded in deed records and the recording of a deed in the miscellaneous record is not notice of the deed or its contents to a subsequent *bona fide* purchaser. pp. 115, 136.

6.   Vendor and Purchaser.—*Record of Deeds.—Entry Book.—Notice.—Statutes.*—Under §3986 Burns 1908, §2951 R. S. 1881, providing that every deed shall be deemed recorded at the time so noted in the entry book, the entries made in such book merely fix the time of recording as between different conveyances and do not constitute notice of the record of a deed, nor of its contents. pp. 115, 134.

7.   Mortgages.—*Foreclosure.—Parties.—Record of Deeds.—Notice.—Deed Not in Chain of Title.*—In a foreclosure proceeding the plaintiff need not look for claims outside the chain of title, so that the grantee in a deed executed by a stranger to the record title is not a necessary party in order to cut off equities of redemption, where plaintiff has no actual notice, since such deed is not notice to him of such grantee's claim. p. 119.

8. '   Mortgages.—*Foreclosure.—Parties.—Record of Deeds.—Notice.—Deed Recorded in Miscellaneous Record.*—Where a deed of trust given subsequent to a mortgage, though entered in the entry book, was recorded in the miscellaneous record instead of the deed record, such entry book entry was not sufficient to put a *bona fide* puchaser of the mortgage on inquiry, and, since he was not bound to look beyond the deed records in searching the chain of title, foreclosure of the mortgage was sufficient to bar the equity of redemption of those claiming under such trust deed although they were not made parties to the proceeding. pp. 119, 122.

9.   Mortgages.—*Instruments Constituting Mortgages.*—Any instrument which is executed for the purpose of securing a debt is a mortgage. p. 121.

10.   Mortgages.—*Trust Deeds.—Power of Sale.—Notice.*—Although the power of sale contained in a trust deed or mortgage is valid, it is the rule that a sale of the property, whether under such power or under a foreclosure by judicial proceedings, cannot bar the equity of redemption without notice. p. 121.

11.   Mortgages. — *Instruments Constituting Mortgages. — Trust Deeds.*—A trust deed which in form conveys the title, but clearly

showing on its face that it is simply security for a debt, is a mortgage. p. 121.

12. MORTGAGES.—*Law Governing.*—A trust deed or mortgage of land in this State, though made outside the State by nonresidents, is governed by the laws of this State. p. 121.

13. MORTGAGES.—*Foreclosure.—Title of Purchaser.*—Where a trust deed, which was in fact a mortgage, was foreclosed by judicial proceedings by the purchaser of the note which such deed was given to secure, and he purchased the property at the sheriff's sale and thereafter conveyed the same, the title acquired by him and his grantees was derived from the foreclosure proceeding alone, and his prior purchase of the note did not operate to transfer to him the legal title under the trust deed given to secure such note. p. 122.

14. VENDOR AND PURCHASER.—*Bona Fide Purchasers.—Effect of Deed Recorded in Miscellaneous Record.*—Purchasers of land, claiming through a common grantor in a regular, recorded chain of title in the proper records, are *bona fide* purchasers, in the absence of actual notice, notwithstanding a prior deed under which others claim was entered in the entry book, if such deed was recorded in the miscellaneous record instead of the deed record. p. 123.

15. APPEAL.—*Review.—Harmless Error.—Failure to State Conclusions of Law on Certain Issues.*—Where, in an action to quiet title, the facts were specially found and conclusions of law thereon stated, and under the findings recovery by appellants is precluded, the failure of the court to state conclusions of law on certain issues, though perhaps not a proper practice, was harmless. p. 124.

16. LIMITATION OF ACTIONS.—*Recovery of Real Property.—Execution Debtors.*—Where the real owner of property procured the holder of a nominal title to execute a trust deed to secure the payment of a note, and thereafter caused such holder of the nominal title to convey to a trustee, without consideration, and subsequently the prior trust deed or mortgage was foreclosed and the property sold and possession taken by the purchaser, such real owner of the land was an execution debtor, and since the trustee in the second deed was a mere volunteer, the *cestuis que trustent* cannot claim under such trustee, but their claim is founded on the rights of such original owner, and hence were barred in ten years by the provisions of §295, subd. 3, Burns 1908, §293 R. S. 1881, that actions for the recovery of real property, brought by an execution debtor, or any one claiming under him, by title acquired after date of judgment, shall be brought within ten years after the sale. p. 124.

17. LIMITATION OF ACTIONS.—*Quieting Title.*—Actions to quiet title are barred by the statute of limitations in fifteen years. p. 125.

18. ADVERSE POSSESSION.—*Elements.*—*Claim of Title.*—A duly recorded sheriff's deed, describing the property, constitutes constructive possession, and is in and of itself notice to the world of the claim of title. p. 125.

19. ADVERSE POSSESSION.—*Extent of Possession.*—Where one is in possession under color of title, the occupancy asserted by him covers all the land within the description of his deed. p. 126.

20. MORTGAGES.—*Redemption.*—*Laches.*—Where a sheriff's deed of land sold in a foreclosure proceeding was recorded in 1877, and in 1887 the land was conveyed by the purchaser to plaintiff, who took and continued to hold possession and expended a large sum in making improvements, and in 1906 brought an action to quiet title and obtained judgment by default quieting the title in him, and where the land, shortly before the bringing of such action, had increased enormously in value, heirs of the mortgagor were barred by the application of the doctrine of laches, where, in 1908, they caused the judgment by default to be opened and filed cross-complaints in whch they sought for the first time to redeem and recover possession of the land on account of defects in the foreclosure proceeding. pp. 127, 130.

21. LIMITATION OF ACTIONS.—*Suspension.*—*Nonresidents.*—*Application of Statutes.*—Section 299 Burns 1908, §297 R. S. 1881, suspending the operation of the statute of limitations on account of nonresidence, does not apply to persons who are at all times nonresidents of the State, and applies only to defendants, so that it cannot be invoked in aid of an action on a cross-complaint by a nonresident cross-complainant. p. 127.

22. LIMITATION OF ACTIONS.—*Foreign Statutes.*—Where a cause of action arising in another state, though enforceable in this State, is barred by the statute of limitations in that state, such statute will operate as a bar in this State under the provisions of §299 Burns 1908, §297 R. S. 1881. p. 128.

23. LIMITATION OF ACTIONS.—*Redemption from Mortgages.*—The fifteen year statute of limitations applies to an action for equitable redemption which accrues at the expiration of the year for statutory redemption of land sold under foreclosure of a mortgage. p. 128.

24. VENDOR AND PURCHASER.—*Record of Deeds.*—*Notice.*—*Special Findings.*—The finding of the court, in an action involving the right to possession of land, that plaintiff had such notice as the records imported, does not amount to a finding that he had actual notice of defendant's claim, and, where the deed under which defendants claimed was not recorded in the deed records, the fact

that plaintiff had an abstract showing a summary of such deed, did not amount to constructive notice. p. 129.

25. VENDOR AND PURCHASER.—*Notice.—Constructive Notice.*—Where constructive notice to a purchaser of real estate is relied on, it must be such notice as is required by statute, to make it constructive. p. 129.

26. MORTGAGES.—*Foreclosure.—Redemption.*—Where the grantee of the purchaser of land at a foreclosure sale in 1877 obtained a judgment by default in 1906 quieting the title, and thereafter sold some of the land, the land so sold by him could not be reached in a proceeding consequent on vacating such judgment, especially where such grantee was himself a purchaser in good faith. p. 130.

27. TRUSTS.—*Payment of Consideration by Another.—Title.*— Where the persons furnishing the money for the purchase of land procured a third party to take a conveyance thereto, but the deed on its face did not disclose that such third party held the title for the use or benefit of any other person, a resulting trust exists for the benefit of those furnishing the purchase money, under the provisions of §4019 Burns 1908, §2976 R. S. 1881, where there was at the time an oral agreement that the title should be held for the benefit of the persons furnishing the purchase money. p. 133.

28. APPEAL.—*Questions Presented for First Time on Petition for Rehearing.*—Under the rules, the court is not required to consider questions presented for the first time on petition for a rehearing. p. 137.

29. DEEDS.—*Record.—Trust Deed.*—A trust deed should be recorded in the deed records, under the rule that the transfer of any interest in real estate should be recorded in the deed records. p. 137.

30. EVIDENCE.—*Judicial Notice.*—The Supreme Court takes judicial notice as to the time when a circuit court was in session. p. 139.

From Lake Circuit Court; *H. J. Paulus,* Special Judge.

Action by John Gunzenhauser against Susan W. Sinclair and others. From a judgment for plaintiff, Susan W. Sinclair and another appeal. *Affirmed.*

*Wm. J. Whinery, John F. Reilley* and *John H. Gillett,* for appellants.

*John B. Peterson, Otto J. Bruce, Peter Crumpacker, H. F. McCracken, J. Kopelke, Knapp & Campbell* and *John R. Cochran,* for appellees.

MYERS, J.—Appellee Gunzenhauser instituted in the Lake Circuit Court on March 17, 1906, an action to quiet title to one section of land, except certain railroad rights of way, in Lake County, Indiana, naming as defendants a number of persons, including appellant Susan W. Sinclair, and "all the heirs, devisees, legatees and trustees of Lucy A. Ellis," which included appellant Gertrude Cleveland, a daughter of Lucy A. Ellis. A supplemental complaint was filed April 27, 1906, more specifically describing the land. Publication was made, and on May 21, 1906, a decree quieting title in appellee Gunzenhauser was entered on default. On March 2, 1908, appellant Gertrude Cleveland filed her petition to set aside the default and judgment, and be permitted to defend, and tendered an answer, and on March 4, 1908, the decree was vacated. On May 5, 1908, appellant Sinclair filed her petition to set aside the decree and default, and be permitted to defend, and tendered an answer, and on May 22, 1908, the decree was vacated, and on May 29, 1908, appellant Cleveland filed her cross-complaint against plaintiff and her codefendants, and additional parties, to quiet her title to the undivided one-half of the same real estate. On September 8, 1908, appellant Cleveland filed an amended cross-complaint, to quiet her title to the undivided one-half of the real estate, against the original plaintiff and all the original defendants, and the defendants named in the cross-complaint of appellant Cleveland. On December 18, 1908, appellant Sinclair filed an amended cross-complaint against plaintiff and all cross-defendants, making additional parties defendants. These cross-complaints were alike, each seeking by one paragraph to quiet title to the real estate described in plaintiff's complaint, but more particularly described; a second paragraph in ejectment; a third paragraph to enforce an express trust in the land, and to quiet title; and a fifth paragraph asking to be permitted to redeem from a mortgage, and tendering the amount claimed to be due, and upon payment seeking to have the title

quieted. Appellant Sinclair filed a sixth paragraph to quiet her title to the whole of the land, a seventh claiming equitable ownership and demanding possession and damages, and a supplemental cross-complaint to each paragraph, setting out certain facts from which she claimed equitable ownership, and demanding that her title be quieted, and for possession. Answers in general denial were filed to the complaint by appellants Sinclair and Cleveland, and answers in general denial were filed to the cross-complaints of appellants Sinclair and Cleveland, and numerous affirmative answers, which were all withdrawn before trial except the answers to the fifth paragraph of each of their cross-complaints. The answers to the fifth paragraphs of their several cross-complaints were in general denial, and the five, ten, fifteen, and twenty years' statute of limitations; to these affirmative answers there was reply in general denial, and nonresidence of appellants for more than twenty years next before the commencement of the suit. There was a special finding of facts made, conclusions of law stated, and judgment rendered for appellees. The errors assigned are: as to each conclusion of law; in overruling the motion for a *venire de novo;* and in overruling the motion for a new trial.

The facts found embrace 86 pages of closely-printed matter, but we endeavor to give sufficient to present the questions in the case, as the facts are found by the trial court. On October 2, 1872, one Kerfoot, the common source of title, was the owner of the real estate in controversy, and on that day executed a conveyance of the same to Amariah Dewey, for a named consideration of $6,400. The deed was recorded in Lake County on October 5, 1872. The purchase was made by Joseph F. Sinclair and William S. Proudfoot, who represented to Dewey that they had a purchaser who would within a few days purchase from Dewey; that Dewey should provide the money to secure the real estate, and that the profits should be equally divided among them. On January 6, 1873, Dewey, at the request of Sinclair, acting for

himself and as agent of Proudfoot, signed and acknowledged a warranty deed for the land to appellant Susan W. Sinclair, which deed was delivered to Joseph F. Sinclair on or prior to March 28, 1873, and on that day recorded in the proper deed record in Lake County. The consideration for the deed to Susan W. Sinclair was the payment by Joseph F. Sinclair and Proudfoot to Dewey in equal portions of the sum of $4,033.37 in cash received by them from a mortgage or trust deed executed by said Susan W. Sinclair on March 28, 1873, to Henry W. Bishop, as trustee, to secure the payment of $8,000, borrowed by Joseph F. Sinclair and Proudfoot from Joel H. Wicker, evidenced by their promissory note to him, executed in the State of Illinois, dated March 28, 1873, payable one year after date at the First National Bank of the city of Chicago, Illinois, and the assumption by Susan W. Sinclair in her deed of an indebtedness of $4,384.66, secured by a mortgage on the land executed by Dewey to one Benze on October 15, 1872. Susan W. Sinclair, an unmarried woman, took the title under an oral agreement between herself and Joseph F. Sinclair, who was her father, acting for himself and Proudfoot, to hold the land in trust for her father and Proudfoot in equal shares, without any intent to cheat, hinder or delay the creditors of either, and without any fraudulent intent on the part of any one. At the request of the father, and with the knowledge and consent of Proudfoot, Susan W. Sinclair, on March 28, 1873, executed to Bishop, trustee, a mortgage, or trust deed, to secure the payment of the $8,000 borrowed by them of Wicker, and the mortgage, or trust deed, was recorded in the proper record in Lake County, Indiana, on June 26, 1874, at which time, and up to June 20, 1874, Susan W. Sinclair held the land in trust for Joseph F. Sinclair and Proudfoot, without any other conveyance or mortgage, and at the time of the execution of the mortgage, and for many years thereafter, the land was not worth more than the Wicker debt. After the payment to Dewey, there remained

from the Wicker loan a net profit of $800 to those entitled to it. As some stress is laid on the force and effect of the instrument executed by Susan W. Sinclair to Bishop, trustee, to secure the Wicker note, we set it out.

"This indenture made this 28th day of March, in the year of our Lord one thousand eight hundred and seventy three, between Susan W. Sinclair (unmarried) of the city of Chicago, in the County of Cook and State of Illinois, party of the first part, and Henry W. Bishop, of the City of Chicago, in the County of Cook, State of Illinois, party of the second part, Witnesseth: Whereas, Joseph F. Sinclair and William S. Proudfoot, of said City of Chicago, have made their one (1) certain promissory note, bearing date Chicago, Illinois, March 28th 1873, payable to the order of Joel H. Wicker, one (1) year after the date thereof at the First National Bank of Chicago, Illinois, with interest at the rate of ten per cent per annum, said note being for the sum of Eight Thousand Dollars ($8,000), said note being given for money loaned on the premises hereinafter described.

Now, therefore, said party of the first part, in consideration of the premises, and one dollar in hand paid by said party of the second part, the receipt thereof is hereby confessed, do hereby grant, bargain, sell and convey unto said party of the second part, his heirs, assigns or successors in trust, forever, all the premises situated in the County of Lake and State of Indiana and described as follows [here follows a description]. To have and to hold the same with all and singular the privileges and hereditaments thereunto belonging, unto the said party of the second part, his heirs, assigns, or successors in trust, forever. In trust nevertheless, that in case of default in the payment of said promissory note, interest or either or any part thereof, or in case of a breach of any of the agreements herein mentioned, then on application of the legal holder of said note, it shall be lawful for said party of the second part, his heirs, assigns or successors in trust, to enter into, and upon the premises hereby granted, or any part thereof, and to receive all rents, issues and profits thereof, and to sell or dispose of said premises or any part thereof, either in mass, or in separate parcels, as said second party, his heirs, assigns, or successors, may prefer, at public auction, at the north door of the Court House

in the City of Chicago, in the State of Illinois, for the
highest and best price the same will bring in cash,
twenty (20) days notice of such sale being first given
in one of the newspapers published in said City of Chi-
cago; to adjourn such sale from time to time, and for
such time as may be thought expedient, and to make
and deliver to the purchaser or purchasers at such sale,
good and sufficient deed or deeds of conveyance for the
premises sold, which deed or deeds shall be in all such
cases prima facie evidence of the truth of the recital
herein, and that such sale, was in all respects according
to the requirements of this deed; and out of the pro-
ceeds of such sale, after first paying all costs of adver-
tising and sale, commissions and all other expenses of
this trust, and all moneys advanced for taxes and other
liens, and assessments, with the interest thereon, to pay
the principal and the interest due on said note, accord-
ing to the tenor and effect thereof, rendering the over-
plus, if any, unto the said party of the first part, her
legal representatives or assigns, on reasonable request;
and it shall not be obligatory upon the purchaser, or
purchasers, at any such sale to see to the application of
the purchase money, which sale or sales so made, shall
be a perpetual bar, both in law and equity against said
party of the first part, her heirs, and assigns, and all
other persons claiming said premises, or any part there-
of, by, through or under said party of the first part or
any of them.

And the said party of the first part, for herself and
her heirs, executors and administrators, covenant and
agree to and with said second party of the second part,
his heirs, assigns, successors in trust, that at the time
of the delivery of these presents she is well seized of
said premises, and hath full right, power and authority
to grant, bargain, and sell the same as aforesaid; that
the same are free from all incumbrances whatsoever,
unless hereinafter specified, that she will and her heirs,
executors and administrators the same shall ever war-
rant and defend against the lawful claims of all per-
sons; that the party of the first part will pay, or cause
to be paid, the said indebtedness when due and payable,
and until said indebtedness is fully paid, or said prem-
ises are sold by virtue hereof, will, in like manner pay
all taxes and assessments thereon when due and payable.

And that she will cause any building upon said
premises to be insured in some safe insurance company
for the insurable value thereof, and upon the request

of said party of the second part, or the legal holder of
any of said indebtedness, assign the policy or policies
of such insurance to said party of the second part, his
heirs, assigns, or successors in trust, as collateral hereto,
and keep the same so insured, and policies assigned as
aforesaid, provided, however, that such insurance shall
not be required for a greater sum than the amount of
said indebtedness then unpaid.    On full payment of
said indebtedness, reconveyance to be made at the cost
of the said party of the first part.    The place of sale
under the powers in this deed instead of being at the
north door of the Court House as specified in the printed
part thereof, shall be at the northeast corner of Adams
and LaSalle streets, in said city of Chicago.   And it is
stipulated and agreed that in case of default in the pay-
ment of said promissory note, or interest as aforesaid,
or a breach in any of the covenants or agreements
herein mentioned, the whole of said promissory note and
the interest to the time of the sale, shall at the option
of the legal holder of the said note, become due and
payable, and the said premises may be sold as if the
said indebtedness has matured, and further, that in case
of the death, resignation, removal from the said County
of Cook, or other inability to act of the said party of
the second part, then L. C. Panis Freer of said County
shall be and is hereby appointed and made successor in
trust herein, with like power and authority as is hereby
vested in said party of the second part. And said party
of the first part hereby expressly waives and releases
all right, title and interest whatever in and to the above
described premises, and each and every part thereof
which is given by any and all laws of the state of Illi-
nois pertaining to the exemption of the Homestead from
sale on execution or otherwise.''

On June 20, 1874, Susan W. Sinclair, at the oral request
of her father, executed to Washington Libbey a convey-
ance, which, owing to the importance attached to it by some
of the parties is set out, and is as follows.

"This indenture, made this twentieth day of June,
A. D. 1874, between Susan W. Sinclair (spinster), of
the City of Chicago, in the County of Cook and State
of Illinois, party of the first part and Washington Lib-
bey of the same place, party of the second part.   Wit-
nesseth, That said party of the first part for and in

consideration of the sum of one dollar to her in hand paid by said party of the second part the receipt thereof is hereby acknowledged, and other good and valuable consideration, has granted, bargained and sold and conveyed, and by these presents does hereby grant, sell and convey unto said party of the second part and his successor in trust herein, and any and all real estate or any interest of every kind which I have in any real estate, and all houses on leased land which I have in the County of Cook and State of Illinois, and the County of Lake in the State of Indiana, or anywhere in said states of Indiana and Illinois. To have and to hold the same with the rights and appurtenances thereto belonging unto said trustee and his successor in trust herein. In trust however for the sole use and benefit of my mother, Lucy A. Sinclair, of Chicago, in said Cook County, my sister Lucy A. Sinclair of said Chicago and myself (said Susan W. Sinclair) as aforesaid, and hereinafter set forth. I hereby give said Washington Libbey as such trustee, and his successors in trust herein, full power and authority to sell and convey, or release, or mortgage, or convey by trust deed, any or all of said above mentioned real estate, or any of my interest in real estate as he shall, in his discretion deem best for the interest of my said mother, my said sister and myself, or the survivors or survivor of us. I hereby direct said Washington Libbey and his successor in trust herein, to first out of any proceeds of any real estate belonging to me as aforesaid, or any of my said interests therein and hereby conveyed that shall come to his hands, pay all debts and demands due from me to any person whatever, and all taxes, and demands of every nature due upon, and on account of said real estate, or my interest therein, and also all debts and demands now outstanding, and which shall hereafter become due upon, or on account of said real estate, or any of my interests therein, and full power and authority is hereby given to said trustee and his successors in trust herein, to invest the remainder of such proceeds after paying all such debts and demands in any way that he shall deem best for the interests of my mother, my sister and myself or the survivors, or survivor of us, and full power and authority is hereby given to said trustee and his successors in trust herein to lease or mortgage, or sell and convey, or convey by trust deed, any real estate or property in which said proceeds shall be invested, as said trustee shall deem best for the inter-

ests of my said mother, my said sister and myself or the survivor or survivors of us. During the life of my said mother and so long as this trust shall continue, I hereby order and direct my said trustee and his successors in trust herein, to pay to her the proceeds arising from any of said property or interest therein (except such portion as shall be paid for on account of any taxes, debts or demands above mentioned, and except also such portion thereof as shall be invested as aforesaid in other property) quarterly, or whenever she shall request him so to do. I hereby order and direct my said trustee and his successor in trust herein, during the continuance of this trust, to prepare and to present to my said mother and in case of her decease, to my said sister and myself or the survivor of us, semi-annually, a true statement and account of which said acts and doings as such trustee. I hereby order and direct that the trust hereby created shall cease and determine by limitation at the expiration of six years from the date thereof, but the same may be extended upon the request of my said mother, my said sister and myself, or any two or us in writing to said trustee or his successor in trust herein, for such further time as shall be specified in such request. Upon the expiration of the trust hereby created, if the same shall occur prior to the decease of my said mother, I order and direct my said trustee upon such expiration to deliver and convey to my said mother all property, both real and personal, then remaining in the hands of said trustee belonging to this trust, and in the case of the death of my said mother prior to the expiration of this trust, then upon the expiration I hereby order and direct said trustee to allow, deliver and convey to my said sister and myself in equal proportions all the property, both real and personal then remaining in the hands of such trustee, or the whole of said property to the survivor of us as our, and each of our sole property forever. In case of any and all sales or mortgage or conveyance by trust deed of any property or real estate under and by virtue of this deed of trust, it shall not be obligatory upon the purchaser or purchasers thereof or the mortgagee or the trustee or beneficiary in the trust deed, to see to the application of the purchase money secured by any such mortgage or trust deed.

In case of the death, inability or refusal of said Washington Libbey to act as such trustee, then Henry M. Shepard of said Chicago, is hereby appointed suc-

cessor in trust herein, with full power and authority to execute the provisions of this trust. I hereby give Washington Libbey full power and authority to resign his position as such trustee at any time that he shall see fit so to do, and upon his filing such resignation in writing in the office of the Recorder of Deeds of said Cook County, and thereafter he shall cease to be liable in any way upon, and on account of this deed of trust; and thereupon said Henry M. Shepard shall become successor in trust herein, with full power and authority to execute the provisions of this trust.''

This instrument was recorded in Lake County, Indiana, on June 26, 1874, in the *miscellaneous record.* On the entry book, under the headings and within the columns as provided in §3986 Burns 1908, §2951 R. S. 1881, in the column ''Description of Lands'' were the words, ''All real estate in Lake County'', and in the column, ''vol. and page where recorded'', were the words and figures, ''Book 3 pages 1 and 2'', grantor ''Susan W. Sinclair'', grantee ''Washington Libbey''.

At the time of this conveyance said Susan W. Sinclair had no interest in the property other than as trustee under the original arrangement at the time the deed was made to her by Dewey. The deed was acknowledged in the State of Illinois, where all the parties resided.

On July 10, 1874, said William S. Proudfoot, his wife joining him, executed to Nathaniel T. Wright, for the named consideration of $13,000, a warranty deed for the undivided one-half of the land in controversy, it being recited in the deed that it is ''the same land held by and in the name of Susan W. Sinclair, and conveyed to her by A. A. Dewey for said Proudfoot, he being half and equal owner of the said section,'' and the deed was regularly recorded in the recorder's office of Lake County, July 16, 1874.

Joseph F. Sinclair died intestate as to all his property in the city of Chicago on July 22, 1874, leaving as his sole heirs his widow, Lucy A. Sinclair, his daughters, Susan W. Sinclair and Lucy A. Ellis.

Lucy A. Sinclair, his widow, died testate in the city of Chicago on October 12, 1885, and her will was probated in Cook County on June 5, 1893, by the terms of which she bequeathed and devised all her property to appellant Susan W. Sinclair. The will was executed January 31, 1885, at Chicago, Illinois, and Susan W. Sinclair was named as executrix, and procured the probate of the will. In her affidavit for probate of her mother's will, Susan W. Sinclair made oath that her mother left no property of any kind, and that she was advised that it was desirable to have the will probated in order to cure defects of title to certain real estate belonging to other parties than the decedent. Washington Libbey made no conveyance either before or after the death of Lucy A. Sinclair. The only real estate to which Susan W. Sinclair held title, or in which she had any interest on June 20, 1874, was the land in controversy in this action. Subsequent to March 25, 1873, and before maturity, Wicker sold the note executed to him by Joseph F. Sinclair and Proudfoot to one Isaiah F Libbey, and indorsed it for a valuable consideration, and Libbey was an innocent purchaser, and had no notice, nor had Wicker at any time, that Susan W. Sinclair was not the absolute owner in fee of the land in controversy. On April 10, 1875, Isaiah F. Libbey filed a complaint in the Lake Circuit Court, of Indiana, on said note, and to foreclose the trust deed, or mortgage, making the only parties thereto William S. Proudfoot, Susan W. Sinclair, Henry W. Bishop and Joseph F. Sinclair. On July 14, 1875, a summons in the following words and figures was issued by the clerk of the Lake Circuit Court:

"State of Indiana, ⎱ ss
    Lake County,   ⎰

The State of Indiana to the Sheriff of Lake County, Greetings:

You are hereby commanded to summons Joseph F. Sinclair, William S. Proudfoot, Susan W. Sinclair, and Henry W. Bishop to appear in the Circuit Court of Lake County, before the Judge thereof, on the second

day of the next term of this court to be held in the Court House in Crown Point on the first Monday of September, 1875, to answer to the complaint of Isaiah F. Libbey, and of this writ make due return.

Witness, William W. Cheshire, Clerk of said Court, and the seal thereof, thereunto affixed, at Crown Point, the 14th day of July, 1875.

William W. Cheshire,
Clerk Lake Circuit Court."

Upon which was indorsed the following affidavit:

"State of Illinois, ⎱ ss:
  Cook County,    ⎰

George C. Christian, being duly sworn according to law on his oath, says that on the thirtieth day of July, A. D. 1875, in the City of Chicago and State of Illinois, he did serve the summons hereto attached in the cause of Isaiah F. Libbey vs. Joseph F. Sinclair, et al, pending in the Lake Circuit Court of Indiana, on William S. Proudfoot, Susan W. Sinclair and Henry W. Bishop, named in said summons, by then and there reading the same to them, and that the persons so served are the identical persons named in the said entitled cause, the said Joseph F. Sinclair not found.

George C. Christian.

Subscribed and sworn to this 30th day of July, A. D. 1875.

Don J. Parry,
Notary Public."

The affidavit was not attested by any clerk of any court of the State of Illinois, nor was there any certification by any clerk of any court of that state that Don J. Parry was, or is by the laws of that state, empowered to administer oaths or affirmations, or to take affidavits within the state. On September 10, 1875, the Lake Circuit Court entered on its records the following order and decree:

"Now comes the plaintiff by counsel, and shows to the Court by the affidavit of George C. Christian attached to the summons heretofore issued in this behalf, that defendants, William S. Proudfoot, Susan W. Sinclair and Henry W. Bishop have been duly served with summons out of this State, which summons and affidavit are in these words (insert). Whereupon said

defendants so served are each three times severally called and come not, but herein wholly make default, and a jury being waived, this cause is submitted to the Court for trial, and the Court after hearing the evidence, finds for the plaintiff that there is due him from said defendants on the note in this said complaint mentioned, the sum of $9,954.31, and that said mortgage in the plaintiff's complaint mentioned, was given to secure the payment of said note."

Then follows a formal judgment of foreclosure of the mortgage, and order of sale in default of payment, and continuance of the cause as to Joseph F. Sinclair. On the trial of this cause it was found that there could not be found among the files in the office of the clerk of the Lake Circuit Court any affidavit of the nonresidence of either of the defendants to the foreclosure proceedings. No order of the court was ever entered on its records for the publication of notice, and no order authorizing the issuance of summons for them to be served without the State was entered on the order book of that court. The record is silent as to whether any affidavit of nonresidence was ever made or filed, or whether any affidavit was ever filed, or whether any order for publication was made, or order for summons to be served out of the State; but there is nothing on the records or among the files showing, or tending to show, that such affidavits and orders were not made, and there is nothing on the records or among the files showing, or tending to show, that the court did not acquire and have jurisdiction of all the defendants to the foreclosure except Joseph F. Sinclair, and that the court did have jurisdiction of the persons of all the other defendants in that action. On a certified copy of the decree and order of sale issued to him, the sheriff of Lake County sold the mortgaged property on November 13, 1875, to Isaiah F. Libbey, at his bid of $6,000, and the net proceeds of the sale were $5,903.75, and made his return accordingly, which was entered in the proper record, and a certificate of purchase issued to Libbey, and

on February 22, 1877, a sheriff's deed was executed to Libbey, the purchaser, and the deed was recorded in the proper record in the recorder's office of Lake County, Indiana, on February 26, 1877. Washington Libbey never resigned his position as trustee under the deed of June 20, 1874, and died in 1891, and Henry M. Shepard, named in the deed as successor in the trust, never acted as trustee, or entered on the duties of trustee, and is now dead. Lucy A, daughter of Joseph F. and Lucy A. Sinclair, married one Ellis, and from 1869 to 1896 resided in Chicago, Illinois, and in San Francisco, California, for nine years next preceding her death, which occurred there October 15, 1907, prior to which time, since 1896, she resided in Seattle, Washington, and Portland, Oregon. She left three children surviving her, one of whom was appellant Gertrude Cleveland, and by her will, executed in San Francisco, California, on October 13, 1907, devised and bequeathed all her property to said Gertrude, and an authenticated copy was, on September 17, 1908, at the request of Gertrude Cleveland, allowed and filed and recorded in the Lake Circuit Court, of Indiana, as her last will and testament. Neither Joseph F. Sinclair, William S. Proudfoot, Henry W. Bishop, Joel H. Wicker, Washington Libbey, Isaiah F. Libbey, Joseph Donnersburger, Moses J. Richards, John Gunzenhauser, Lucy A. Sinclair, wife of Joseph F. Sinclair, Susan W. Sinclair, Lucy A. (Sinclair) Ellis, Gertrude Cleveland, Caroline Sommerville, widow of Nathaniel T. Wright, Ida Wright, daughter and sole heir of Nathaniel T. and Caroline Wright, was ever a resident of the State of Indiana from and after the beginning of the year 1873, and Isaiah F. Libbey was a nephew of Washington Libbey. On July 13, 1907, Caroline Wright and Ida Wright executed to appellee Gary Land Company a quitclaim deed for the north half of the land in controversy, and the deed was regularly recorded in Lake County on July 20, 1907. Bishop, trustee in the deed of

trust by Susan W. Sinclair, never sold the land under the power conferred on him, neither was Joseph F. Sinclair, Lucy A. Sinclair, his wife and widow, Lucy A. (Sinclair) Ellis, nor any of her heirs, devisees or legatees, nor Washington Libbey, trustee, nor his successors in the trust, nor Susan W. Sinclair, in the capacity of, or as heir, legatee or devisee of Lucy A. Sinclair, her mother, ever made a party to any judicial proceeding for the foreclosure of the trust deed, but Susan W. Sinclair was a party to the foreclosure in the Lake Circuit Court. The will of Lucy A. Sinclair was not filed in Indiana by Susan W. Sinclair, nor by any one for her, but was filed by appellee Gunzenhauser, and admitted to probate in Lake County, Indiana, on February 22, 1909. After the death of Joseph F. Sinclair, Washington Libbey was appointed administrator of his estate, from which Lucy A. Sinclair, the widow, received approximately $6,000, and at the death of Lucy A. Sinclair her two daughters each received approximately $1,600, and in 1906 Susan W. Sinclair had remaining approximately $1,000. The widow and daughters had no other source of income than their labor. On November 18, 1876, Isaiah F. Libbey filed a verified claim against the estate of Joseph F. Sinclair for the balance of the Sinclair and Proudfoot note, a copy of which was attached, and his agent filed with the claim an affidavit of the balance due, showing a credit "by net proceeds of sale of land securing this note, on November 13, 1875, $5,903.75." The claim was allowed on December 20, 1876, for $4,615.87, by the administrator. Appellants have known that $5,903.75 was realized from the foreclosure sale, and of the fact of the filing and allowing of the claim against the estate, and $583.83 was the amount paid by the estate. The final report was filed January 3, 1881, and on June 3, 1881, Lucy A. Sinclair was served with notice of the filing of the report, and on June 11, 1881, Lucy A. Sinclair and Susan W. Sinclair waived notice of the filing of the report, and final settlement was made on June 23, 1881, and

the administrator discharged.  Some time in the year 1883, prior to April 20, Joseph Donnersburger was requested by Washington Libbey to take and hold for him the legal title to said real estate from said Isaiah F. Libbey, who on that day conveyed the land by warranty deed to Donnersburger, and delivered the deed to Washington Libbey; Donnersburger paid no consideration, and whether Washington Libbey paid any consideration, the court finds there is no evidence to prove or disprove; the deed itself recites a consideration of $8,500.  On December 24, 1887, Donnersburger and wife conveyed to Washington Libbey, by quitclaim, for a named consideration of $18,000, but Donnersburger received no consideration.  On December 17, 1887, Washington Libbey, for a named consideration of $18,000, conveyed by special warranty, as to his own acts, to one Richards, who on December 24, 1887, conveyed to appellee Gunzenhauser for a consideration of $18,000, and this deed, and the deed from Isaiah F. Libbey, and the deed from Donnersburger, and the deed from Washington Libbey were each delivered to Gunzenhauser at the same time, and by him procured to be duly recorded in Lake County, December 29, 1887.  When Washington Libbey signed and acknowledged the deed made by him, he delivered it to one Hillis, with instructions to deliver it on the payment of $18,000, and on December 24, 1887, Gunzenhauser paid $8,000 in checks to the order of Hillis and Richards, and the consideration, so far as Libbey was concerned, was the $8,000 in checks, which he received, but Gunzenhauser conveyed to Richards, as a part of the purchase price, $10,000 in agreed value in real estate.  Each and all of these conveyances recited a consideration equal to, or more than the cash market value of the Lake County land; that Donnersburger was not a purchaser for value, but held the title only for Washington Libbey.  Neither Richards nor Gun-

zenhauser knew that fact, and purchased in good faith, without actual notice of any claim on the part of any other person. Gunzenhauser and Richards went on the land, and looked over it three or four times prior to December 18, 1887. Gunzenhauser was a dealer in real estate in Chicago, and has resided since the year 1885 in Batavia, Illinois, and prior to that time since 1856 resided in Chicago, Illinois. Richards was also a dealer in real estate in the city of Chicago. Prior to closing the purchase, Gunzenhauser presented to a competent, reliable attorney in the city of Chicago an abstract of the title furnished by Richards, which attorney gave him a written opinion that on December 22, 1887, the title was substantially good for the whole tract of land in Isaiah F. Libbey, on the faith of which Gunzenhauser purchased. That abstract contained a substantial summary of the deed of trust from Susan W. Sinclair to Washington Libbey, and of the deed from Proudfoot to Wright, and of the proceedings in the foreclosure suit. At the time said Gunzenhauser purchased said real estate from Moses J. Richards, as heretofore set forth in these findings, said real estate was wild land, totally unsuited for agricultural purposes. On the south side of said section were large sand hills, covered with scrub oak. Said hills were arranged with alternating ridges, with valleys and sloughs, the north part of said section, constituting practically the north half thereof, was mainly a slough, which a considerable portion of the year was covered with water from three to four feet deep. Here and there, however, ridges rose out of the water, and on these ridges grass and black oak grew, and the land surrounding the land in controversy was largely of the same character. At the time Gunzenhauser was taken out to and upon said land by Richards, two railroads were located across the section, one the Michigan Central Railroad, crossing the section from east to west near the center of the section, but somewhat curved in its course, while crossing; the

other railroad, the Pittsburgh, Fort Wayne and Chicago Railroad, crossing the southwest corner of the real estate, leaving a small portion of the section south and west of the railroad. There was also an old wagon roadway, or trail, that crossed the section, and extended from Tolleston, Lake County, Indiana, to a place called Millers, the old roadway or trail following along the ridges. This roadway during most of its course across the section was south of said Michigan Central Railroad, but near the east end of the section the road crossed the Michigan Central Railroad to the north. At the time Gunzenhauser first went on the real estate one Hart, predecessor of Kerfoot, had constructed a wire fence along the south side of the roadway leading from Tolleston, and extending eastward to where the roadway crossed to the north side of the Michigan Central Railroad, at which crossing the wire fence, constructed by Hart, intersected the fence along the south side of the Michigan Central Railroad. The fence so constructed by Hart, together with the railroad fence to the south of the Michigan Central Railroad, and the fence on the north side of the Pittsburgh, Fort Wayne and Chicago Railroad, enclosed a large tract of real estate, including the higher portion of the land in controversy. The fence had been constructed six or seven years prior to the date when Gunzenhauser first saw and entered upon the real estate. Hart, after constructing the fence, pastured cattle and horses on the real estate each year thereafter, until Gunzenhauser purchased from Richards and went into possession. Gunzenhauser on purchasing said real estate went on it, caused a survey thereof to be made by the county surveyor of Lake County, and immediately after such survey he placed nine stones on the boundaries of the real estate to mark the location of the section and the corners thereof; the stones were each about four feet in length, three feet of which was placed in the ground, leaving one foot above the ground, and on the top of each of the stones

Gunzenhauser caused his initials "J. G.", to be cut.    The stones were placed as shown on the accompanying plat.

X—Indicating stones.

This survey was made in the early spring of 1888 by a competent surveyor, and the stones were set in July, 1888, at a cost to Gunzenhauser of $49.35 for the survey and the stones.    In 1889 Gunzenhauser erected a dwelling house, consisting of six or seven rooms, with a basement cased in with flooring, which house was then and there of the value of $1,500, and was located on that part of the section south of the Michigan Central Railroad, and three or four hundred feet east of the west section line.    He commenced construction of the dwelling house in January, 1889, and before its completion, prior to August of the same year, the same was rented and occupied by tenants of Gunzenhauser continuous-

ly up to this date. During the same year Gunzenhauser built a large barn near the dwelling house, said house and barn costing approximately $2,700. During the same year Gunzenhauser constructed a fence along the west section line from the Pittsburgh, Fort Wayne and Chicago Railroad north to the Michigan Central Railroad, and the fence thus constructed, together with the fence theretofore constructed along the south side of the road leading from Tolleston to Millers, and the right of way fence along the railroads, enclosed a part of the lands in controversy, so that the same could readily be used for pasture. In 1890 Gunzenhauser constructed a switch track, connecting with the Pittsburgh, Fort Wayne and Chicago Railroad, located near the southwest side of the land in controversy, and for a few years continued to ship sand from the switch, but after a few years discontinued shipping sand, because the undertaking proved to be unprofitable. In 1891, Gunzenhauser built another frame dwelling, having five rooms, an attic and a basement, on the land in controversy, at a cost, and of the value of $800. This dwelling was located about 300 feet west of the east line of the section, and south of the Michigan Central Railroad. During the same year there was also a small barn built near the house by Gunzenhauser, and before the house was fully completed a tenant of Gunzenhauser moved into the same, and from and after said date said dwelling house has been continuously occupied by tenants of Gunzenhauser up to and until this date. During the same year Gunzenhauser built a switch track connecting with the Michigan Central Railroad, and for a few years continued to ship sand therefrom, but the same proved unprofitable, and he ceased to ship sand from said land after a few years. During 1891 Gunzenhauser constructed a ditch, which drained a portion of the land in controversy, and an effort was made by him to grow potatoes and other vegetables thereon, but the soil was nonproductive, and the farming enterprise was abandoned. Said houses were both

planned by an architect, and all the material for the houses, barns and fences, and all the labor thereon, and in the construction of said ditch and switch track connections, were paid for by Gunzenhauser, at an aggregate cost of approximately $7,500. At the time, Gunzenhauser had employed and worked on the real estate from fifteen to twenty men. Gunzenhauser himself, during the years 1888, 1889 and 1890, was on the real estate as often, at least, as once or twice each and every month. On purchasing the land Gunzenhauser went into immediate possession, and he, together with those claiming under and through him, as is specifically found and set forth, have at all times since his purchase, up to the present time, had and held open, notorious and exclusive possession of all said lands in controversy under claim of right, continuous, adverse and hostile as against all other persons. Since 1889 Gunzenhauser has employed a custodian of the land, who resided within a quarter of a mile of the property, and who went on the same frequently, and had the general control and management thereof, for and on behalf of Gunzenhauser. Immediately after receiving the deed from Richards, Gunzenhauser made large and valuable improvements on the lands in question. The improvements at the time they were made and until 1905 were of the value of one-half the real estate in question. Gunzenhauser did not at the time he agreed to purchase the premises, nor at the time he purchased the same and obtained a deed thereto, nor at any time thereafter until the filing of the cross-complaints in this cause, have any actual notice, or knowledge whatever of any kind or nature that the cross-complainants herein, or any other person or persons had, or claimed to have any right, title or interest in or to the real estate in question; but, on the contrary, he at all times believed himself to be the absolute owner in fee simple of the premises, was a *bona fide* purchaser thereof, and paid more than the actual value thereof at the time he purchased the same, in absolute good faith, believing that

he was obtaining thereby the absolute title in fee simple to the real estate in question, and made the improvements on the real estate, believing himself to be the absolute owner thereof, and he and his grantees have ever since paid the taxes, thereon. Susan W. Sinclair, Lucy A. Ellis, mother of said Gertrude Cleveland, Lucy A. Sinclair, the mother of Susan W. Sinclair and Lucy A. Ellis, and Gertrude Cleveland, each and all, were at all times, and Susan W. Sinclair and Gertrude Cleveland are now, under no legal disability, and were not and are not suffering under any physicial or mental infirmity; that each and all said named persons knew, or could have learned from the records of said Lake County, that Isaiah T. Libbey, and all the persons purchasing the real estate in question, or any part thereof, and obtaining conveyances thereof, either directly or by mesne conveyances from Isaiah Libbey, were claiming to be the absolute owners of the land, and paying the taxes thereon, and could have learned that Gunzenhauser and those claiming under him were in possession of the land. Susan W. Sinclair, Lucy A. Ellis, Lucy A. Sinclair and Gertrude Cleveland made no claim and asserted no title whatever to the real estate in question after June 20, 1874, until the filing of the cross-complaints in this action. Susan W. Sinclair, Lucy A. Sinclair, Lucy A. Ellis and Gertrude Cleveland at all times knew of the location of the real estate. Susan W. Sinclair and her sister, Lucy A. Ellis in her lifetime, and Lucy A. Sinclair in her lifetime, each and all knew that Susan W. Sinclair executed a trust deed on the real estate to Bishop, to secure the payment of the note of $8,000, payable to Joel H. Wicker. Susan W. Sinclair and Lucy A. Sinclair, until the death of Lucy A. Sinclair, in 1885, resided in the city of Chicago, Cook County, Illinois, within forty miles of the real estate in question. Lucy A. Ellis and Gertrude Cleveland from March 28, 1873, until 1896 resided in the city of Chicago. Each and all said four last-mentioned persons

were women of intelligence and education. They were at all times conversant with the current events of the day, and were constant readers of the daily newspapers. During 1891, 1892 and 1893 the real estate in question, and several thousand acres in the immediate vicinity thereof, greatly increased in value, because of the contemplated location thereon of the Union Stockyards, then located in the city of Chicago. The proposed location of the stockyards, and the phenomenal rise in price of said real estate at that time, were matters discussed in the daily newspapers during the time, and were matters of common knowledge in the city of Chicago and the vicinity thereof, and commonly referred to as ''the stockyards boom.'' The stockyards were proposed to be located in the immediate vicinity of the real estate in question, and each and all of the four last-mentioned persons knew of the proposed location of the stockyards. None of the four last-mentioned persons were ever on the real estate in question, nor at any time made any effort to learn whether they had any interest therein, nor did they assert or claim that they had any interest therein until the filing of the cross-complaints in this cause, when the cross-complainants had learned that the town of Gary had been located on the real estate in question, and upon several thousand acres in the immediate vicinity thereof. At no time from the year 1873 until it became known in 1905 that the town of Gary was to be located upon and in the vicinity of the real estate in question was the real estate of greater value than the amount of the note of $8,000, secured by the trust deed of Susan W. Sinclair to Bishop, the accrued interest thereon and the taxes paid by the persons claiming to be the owners thereof, and in the possession thereof, except during the period from 1891 to 1893 above mentioned, as the stockyards boom, during which period the real estate in question had a market value many times the amount which it then would have been necessary for the cross-complainants herein, or the persons through whom they claim,

to have paid, to redeem said premises, had they been entitled to redeem the same at that time. Commencing with the early part of the year 1905, persons for and on behalf of the United States Steel Corporation commenced purchasing large tracts of real estate in the vicinity of the location of the real estate in controversy. The steel company laid out and platted a city, afterwards incorporated into the town of Gary, built steel mills, filled in marshes, dredged watercourses, constructed streets, built manufacturing establishments, caused the location of railroads, and the elevation of roads previously located, and changed the right of way of railroads so as better to accommodate the public and the city thus laid out and platted. The result and activity of the steel company caused persons from various parts of the United States to go to this location, known as Gary, and many of such persons invested large sums of money in the purchase of real estate, and the construction of buildings and other improvements thereon. The buildings, conditions, values and the like changed very rapidly through 1905, and more rapidly than the conditions and values had changed in the preceding thirty or fifty years, and the values and conditions continued to change with equal rapidity during each of the years 1906, 1907 and 1908, so that when the cross-complainants filed their cross-complaints in this cause, the property now in controversy was reasonably worth $1,000,-000. No part of the steel mills, or the platted part laid out by the Gary Land Company in the town of Gary, was in or on the lands in question in this suit, neither was any of the constructing or building of manufacturing establishments thereon, and the steel mills were at a distance of from one to two miles from the lands in question in this suit. It is found that until the removal of Lucy A. Ellis from the city of Chicago, in the year 1896, Susan W. Sinclair and said Lucy A. Ellis frequently discussed their business affairs, and at all times prior to the death of Lucy A. Sinclair the three persons saw each other at frequent intervals.

Lucy A. Sinclair and Susan W. Sinclair resided together in the city of Chicago. Susan W. Sinclair, Gertrude Cleveland, and in her lifetime Lucy A. Ellis, were each and all guilty of laches because of their failure to assert any claim to the real estate in question while they knew, or, in the exercise of ordinary diligence, should and could have known, that other persons in good faith and for valuable considerations had purchased the real estate in question, and had placed valuable improvements thereon, and the court finds that it is now inequitable and unjust for the cross-complainants herein to assert or claim any right, title or interest in or to the real estate in question, and by their conduct, with knowledge of all the facts, should be now barred and estopped from asserting any right, title, claim or demand, or to any relief of any kind or character, in and to the real estate in question. Neither of the Libbeys, nor Donnersburger nor Richards ever made any entry upon, or had, or held actual possession of, the lands or any part of them, under any of the various conveyances to them respectively. It is found that whatever rights or interests accrued to, or vested in Wright and his heirs or representatives, or Washington Libbey, as trustee, and his successors in said trust, or the *cestuis que trustent*, or heirs, representatives, legatees or devisees of said Lucy A. Sinclair, widow, or said Susan W. Sinclair, Lucy A. (Sinclair) Ellis, Gertrude Cleveland, Caroline Sommerville or Ida Wright, in or to the real estate in question by virtue of either of the deeds, conveyances, or other instruments in writing set forth, they and each of them had been guilty of laches in failing to assert such rights or interests, and in failing to make claim thereto during the time when the persons who were parties and witnesses to the transaction were alive, and in waiting until the evidence, witnesses and persons who could have testified about the transaction were gone, and in sitting by and seeing the vast and rapid changes taking place in the property, and seeing and permitting large numbers of per-

sons to invest vast sums of money on the strength and reliance that other persons were the owners, and that said persons mentioned, indicated and described were not owners and did not have any right, title or interest therein. Whatever rights or interests accrued to or vested in, said last-named parties in and to the real estate in question, by virtue of said deeds, conveyances or other instruments, the conditions have so changed, and such changes were made under such circumstances, since such rights or interests were acquired, that said named parties, including the cross-complainants herein, and each of them, should now be estopped from making and asserting any claim in and to said real estate, or any part or portion thereof at this time. Gunzenhauser, in good faith, believing that he was the sole and absolute owner of the property in question, has now conveyed divers parts and portions thereof to various parties at and for certain valuable considerations, and has given and executed to such persons so buying and purchasing full warranty deeds, warranting the title thereto (said sales are specifically set forth in the findings) and each of said sales was made by Gunzenhauser in good faith, in the belief that no person other than himself had any right, title or interest in and to said real estate, or that any other person was claiming or asserting an interest therein. Many of such sales were made after the decree quieting the title in the above-entitled cause, and at a time when Gunzenhauser had no notice that said cross-complainants or either of them did not have actual knowledge of such decree. Gunzenhauser had a right to rely on the facts as they appeared to him, and had a right to rely thereon in believing that he was the sole and absolute owner of the property in controversy, and it would be impossible now to place him in *statu quo,* if his title should now be adjudged defective.

Gunzenhauser instituted this action on March 17, 1906, against appellants and the heirs of Nathaniel T. Wright, viz., Mrs. Sommerville and Virginia Wright and others, serv-

ice on whom, including appellants, was by publication, and a decree entered quieting title, after which time, and prior to the default being set aside and the judgment opened, he sold and conveyed the north half of the section and portions of the south half to other persons, until he had disposed of the major portion of the section, before application was made by the appellants to set aside the default and judgment, and be permitted to defend, and by these conveyances numerous other persons received conveyances, and much improvement has been done on the land. The cross-complaint made all these persons and corporations cross-defendants.

The first deed was made to one Miles, an attorney, who acted in bringing the suit to quiet title, for Gunzenhauser at the request of the Gary Land Company, which, prior to bringing the suit through Miles, had contracted for the land, and the suit was brought at the instance of the general attorney for the land company for its benefit, and Miles acted as its attorney. The deed was made May 21, 1906, and recorded August 3, 1906, and on May 22, 1906, Miles conveyed to one Trimble, who was acting for the Gary Land Company, and this deed was recorded August, 1906, and Trimble conveyed to the land company on May 28, 1906, and this deed was recorded August 6, 1906. Miles and the general attorney for the land company had examined the abstract of title summarizing the trust deed to Washington Libbey, and the foreclosure proceedings and had actual knowledge of the record of the trust deed at and after the suit was begun by Gunzenhauser. Neither Miles nor Trimble furnished any part of the money to purchase the land, but it was furnished by the land company, and the title taken for it by Miles and Trimble. At the time of the conveyance the land company knew, and had actual knowledge of the decree quieting title in Gunzenhauser, as had also the general attorney for the land company, and knew that the decree had been

rendered on default, after publication, as to appellants, and the decree remained in full force and effect until March 4, 1908, and the land company, Miles and Trimble were purchasers in good faith, for full value, and did not know that any other person or persons claimed any interest. Neither Miles nor Trimble ever made any entry on the land. All the other persons purchasing from Gunzenhauser purchased in good faith for value in full, two or three prior to, but most of them after, the entry of the decree quieting title, and before application to set it aside. Since May 21, 1906, and up to July 10, 1909, approximately 100 buildings of various kinds have been erected upon the lands sold originally by Gunzenhauser, which have been platted into town lots, but appellants had no notice of such buildings, or of the conveyance by Gunzenhauser, or of the remote grantees under him, who were parties to the cross-complaint. At all times since July 1, 1872, the law of Illinois has been that the right of the grantor in a deed of trust of real estate, given to secure the payment of money to redeem the land is barred in ten years after the maturity of the debt, which the trust deed or mortgage is given to secure. It is found that in case appellants are entitled to redeem the land, the amount of the indebtedness due on the Sinclair and Bishop mortgage is $38,400. Under these findings, the court concluded Gunzenhauser and his grantees, direct and remote, were the owners of the land, and were entitled to a judgment and decree accordingly against each of the cross-defendants, and over motion for a *venire de novo,* and for a new trial, rendered judgment quieting title in appellees.

This appeal is prosecuted by Susan W. Sinclair and Gertrude Cleveland. Many correlated questions are presented, but they all center in the questions of the force and effect of the Bishop mortgage, the Washington Libbey trust deed, the foreclosure proceedings in the Lake Circuit Court, statutes of limitations, laches, estoppel and redemption.

Appellants' position is that they have by the judgment

been deprived of their property without that due process of law guaranteed to them by the Federal Constitution, 5th amendment, clause 1, 14th amendment, and article 1, §§12, 21, of the Constitution of Indiana, on the ground that the judgment is based on the foreclosure proceedings in the Lake Circuit Court, and that the persons holding the legal and equitable title to the land, and through whom appellants derive title, were not made parties to that proceeding.

As to the 5th amendment, it is to be observed that it operates exclusively in restriction of federal power, and has no application to the legislation of the states or the

1.    administration of state laws.    *Barron* v. *Mayor, etc.* (1833), 7 Pet. *243, 8 L. Ed. 672; *Thorington* v. *Montgomery* (1893), 147 U. S. 490, 13 Sup. Ct. 394, 37 L. Ed. 252; *Brown* v. *New Jersey* (1899), 175 U. S. 172, 20 Sup. Ct. 77, 44 L. Ed. 119; *Capital City Dairy Co.* v. *Ohio* (1902), 183 U. S. 238, 22 Sup. Ct. 120, 46 L. Ed. 171.

The particular attack is bottomed on the proposition that due process of law is denied appellants, for the alleged ground that the foreclosure proceeding was void for

2.    three reasons:    (1) That it was not shown that there was an affidavit of nonresidence filed; (2) that it is not shown that there was an order for publication or service of summons outside the State; (3) that there is no certificate of the official character of the notary public who took the affidavit of the service of the summons outside the State. Appellants' contention, that where a statute provides for service of summons outside the State, being in derogation of the common law, it must be strictly followed in order to confer jurisdiction, is clearly sound, but we do not perceive that it is applicable to the record before us. This proceeding involves a collateral attack on a judgment.

It is well said in *Galpin* v. *Page* (1873), 18 Wall. 350, 365, 21 L. Ed. 959: "It is undoubtedly true that a superior court of general jurisdiction, proceeding within the general scope of its powers, is presumed to act rightly. All intend-

ments of law in such cases are in favor of its acts. It is presumed to have jurisdiction to give the judgments it renders until the contrary appears. And this presumption embraces jurisdiction not only of the cause or subject matter of the action in which the judgment is given, but of the parties also. The former will generally appear from the character of the judgment and will be determined by the law creating the court or prescribing its general powers. The latter should regularly appear by evidence in the record of service of process upon the defendant or his appearance in the action. But when the former exists, the latter will be presumed. This is familiar law, and is asserted by all the adjudged cases. * * * But the presumptions, which the law implies in support of the judgments of superior courts of general jurisdiction, only arise with respect to jurisdictional facts concerning which the record is silent. Presumptions are only indulged to supply the absence of evidence or averments respecting the facts presumed.'' The court then goes on to show the reverse of the proposition where there is no room for presumptions, when the record itself discloses the basis of the court's action.

In *Evansville Ice, etc., Co.* v. *Winsor* (1897), 148 Ind. 682, 691, 48 N. E. 592, it is said: ''When the jurisdiction of such a court depends upon the finding of certain facts, the exercise of jurisdiction implies the finding of such facts. * * * It was not necessary, therefore, that all the jurisdictional facts be set out in the order and judgment of the Vanderburgh Circuit Court, a court of general jurisdiction. The exercise of jurisdiction in said proceeding and making the final order and judgment therein implies the finding of the existence of all facts necessary to such jurisdiction.'' This is but another form of statement of the doctrine as laid down in *Galpin* v. *Page, supra.* Both the questions thus far presented are involved with the other and controlling one, of the effect on a judgment when attacked collaterally, even though it is not shown by the

record that the affidavit of nonresidence was filed, or the affidavit was not properly authenticated, to make it presumptively official. The court acted and assumed jurisdiction. There may have been an affidavit filed, or there may have been proof that defendants were nonresidents, and proof of the powers of notaries public, under the Illinois laws, to administer oaths, and it was the duty of the court to be so advised. *Andrew* v. *Ohio, etc., R. Co.* (1860), 14 Ind. 169. It is not a case of the record showing any of these matters lacking, or anything to impeach it, but silence as to matters which may have been shown, and some notice. The court has acted, and in such case the judgment cannot be collaterally attacked, except for fraud, when the court is one of general jurisdiction. *Johnson* v. *City of Indianapolis* (1910), 174 Ind. 691, 93 N. E. 17; *Baltimore, etc., R. Co.* v. *Freeze* (1907), 169 Ind. 370, 82 N. E. 761, and cases cited; *Irvin* v. *Buckles* (1897), 148 Ind. 389, 47 N. E. 822; *Clark* v. *Hillis* (1893), 134 Ind. 421, 34 N. E. 13; *Palmerton* v. *Hoop* (1892), 131 Ind. 23, 30 N. E. 874; *Tucker* v. *Sellers* (1892), 130 Ind. 514, 30 N. E. 531; *Essig* v. *Lower* (1889), 120 Ind. 239, 21 N. E. 1090; *Quarl* v. *Abbett* (1885), 102 Ind. 233, 1 N. E. 476, 52 Am. Rep. 662; *Williams* v. *Stevenson* (1885), 103 Ind. 243, 2 N. E. 728; *Smith* v. *Hess* (1883), 91 Ind. 424; *Oppenheim* v. *Pittsburgh, etc., R. Co.* (1882), 85 Ind. 471; *Stout* v. *Wood* (1881), 79 Ind. 108; *Warring* v. *Hill* (1883), 89 Ind. 497.

Jurisdiction of the person will be presumed in case of domestic judgments of courts of general jurisdiction, when the record shows nothing to the contrary. *Long* v. *Ruch* (1897), 148 Ind. 74, 47 N. E. 156; *Jackson* v. *State* (1885), 104 Ind. 516, 3 N. E. 863; *Bateman* v. *Miller* (1889), 118 Ind. 345, 21 N. E. 292; *Sims* v. *Gay* (1887), 109 Ind. 501, 9 N. E. 120; *Exchange Bank* v. *Ault* (1885), 102 Ind. 322, 1 N. E. 562; *Warring* v. *Hill, supra; Crane* v. *Kimmer* (1881), 77 Ind. 215; *Iles* v. *Watson* (1881), 76 Ind. 359; *State* v. *Osborn* (1900), 155 Ind. 385, 388, 58 N. E. 491;

*Young* v. *Wells* (1884), 97 Ind. 410; *Allen* v. *Shannon* (1881), 74 Ind. 164; *State, ex rel.,* v. *Ennis* (1881), 74 Ind. 17; *McCormick* v. *Webster* (1883), 89 Ind. 105; *Cavanaugh* v. *Smith* (1882), 84 Ind. 380; *Bloomfield R. Co.* v. *Burress* (1882), 82 Ind. 83; *Anderson* v. *Spence* (1880), 72 Ind. 315, 37 Am. Rep. 162; *Dwiggins* v. *Cook* (1880), 71 Ind. 579; *Goar* v. *Maranda* (1877), 57 Ind. 339; *Galpin* v. *Page, supra.* Or where the return is defective or false, or the affidavit is defective or false. *Meyer* v. *Wilson* (1906), 166 Ind. 651, 76 N. E. 748; *Bruce* v. *Osgood* (1900), 154 Ind. 375, 56 N. E. 25; *Stevens* v. *Reynolds* (1896), 143 Ind. 467, 41 N. E. 931, 52 Am. St. 422; *Pilts* v. *Jackson* (1893), 135 Ind. 211, 35 N. E. 10; *Kleyla* v. *Haskett* (1887), 112 Ind. 515, 14 N. E. 387; *Hollingsworth* v. *State* (1887), 111 Ind. 289, 12 N. E. 490; *Dowell* v. *Lahr* (1884), 97 Ind. 146; *Burke* v. *Pinnell* (1884), 93 Ind. 540; *Shoemaker* v. *South Bend, etc., Co.* (1893), 135 Ind. 471, 35 N. E. 280, 22 L. R. A. 332; *Walker* v. *Shelbyville, etc., Turnpike Co.* (1881), 80 Ind. 452; *Ricketts* v. *Spraker* (1881), 77 Ind. 371; *Stoddard* v. *Johnson* (1881), 75 Ind. 20; *Porter* v. *Stout* (1880), 73 Ind. 3; *Fee* v. *Moore* (1881), 74 Ind. 319; *State* v. *Wenzel* (1881), 77 Ind. 428; *Stout* v. *Wood, supra; Essig* v. *Lower, supra; Goodell* v. *Star* (1891), 127 Ind. 198, 26 N. E. 793; *City of Delphi* v. *Startzman* (1885), 104 Ind. 343, 3 N. E. 937; *Dequindre* v. *Williams* (1869), 31 Ind. 444.

We do not perceive, therefore, that there is a denial of due process of law so far as those persons are concerned who were made parties to the action in foreclosure. The contention of appellants is that as they claim through Washington Libbey, trustee, who then held the legal title, and neither he nor the *cestuis que trustent* were made parties defendant, the decree had no force to pass title, and was a nullity as to him and them. The findings show that

3. Susan W. Sinclair had no interest, was a bare trustee of the title, with no power of disposition or man-

agement; that the purchase money was furnished by her father Joseph F. Sinclair and William S. Proudfoot, and the title taken by her under agreement to hold it in trust for them, and it was their property. It thus appears that the real owners of the property were Joseph F. Sinclair and William S. Proudfoot. Under the finding, Washington Libbey was a mere volunteer. He paid no consideration, but it was found that the conveyance by Susan W. Sinclair to Washington Libbey was on the oral request of Joseph F. Sinclair alone. At that time Joseph F. Sinclair and Susan W. Sinclair knew that Proudfoot was the owner of one-half the land, and as neither Washington Libbey nor any of the *cestuis que trustent* paid anything for the conveyance, they were not good faith purchasers or vendees, and as against Proudfoot and as to one-half the land they took nothing, and this is likewise true as to his grantees, if he could convey. The trust is not an active one, and we see no reason why, as between himself and Wright, he might not convey. §4015 Burns 1908, §2972 R. S. 1881; *Caldwell* v. *Boyd* (1887), 109 Ind. 447, 9 N. E. 912; *Elliott* v. *Armstrong* (1829), 2 Blackf. 198. If he could not convey, he at least was bound by the foreclosure to which he was a party. If his conveyance was ineffectual to convey the legal title, he at least transferred his equitable right and interest to Wright by the instrument of July 10, 1874, as between himself and Wright. 28 Am. and Eng. Ency. Law (2d ed.) 1107 and note; *Rogers* v. *Colt* (1848), 21 N. J. L. 704; *Rea* v. *Steamboat Eclipse* (1886), 4 Dak. 218, 30 N. W. 159; *Foster* v. *Friede* (1865), 37 Mo. 36; *Tillson* v. *Moulton* (1860), 23 Ill. 600; *Converse* v. *Noyes* (1891), 66 N. H. 570, 22 Atl. 556; *Sayles* v. *Tibbitts* (1857), 5 R. I. 79; *Ives* v. *Harris* (1863), 7 R. I. 413. Wright's heirs have conveyed the north half of the section in controversy, and are making no claim in this action to the south half, so that in no event could appellants have any claim to more than one-half the land. It may also be noted that the record of the

deed by Proudfoot, a stranger to the title, to Wright,
4. did not give constructive notice to purchasers, in good
faith. Wade, Notice (2d ed.) §223.

The next inquiry is as to the effect of the foreclosure
to which Washington Libbey, trustee; was not a party, nor
was Joseph F. Sinclair, who was in fact not living, nor any
of the *cestuis que trustent,* except Susan W. Sinclair.
This inquiry involves the question of the effect of the deed
to Libbey for the other half interest which Joseph F. Sin-
clair did own, and the place of its recording. This deed
was not recorded in the deed records, but in a miscellaneous
record. The statute requires deeds to be recorded in deed
records. §949 Burns 1908, §915 R. S. 1881. Re-
5. cording in the miscellaneous record was not notice
of the deed or its contents, even to a subsequent *bona
fide* purchaser, much less as to a prior purchaser in good
faith, as Isaiah F. Libbey is found to have been, any more
than recording an instrument not entitled to record could
be. *Etzler* v. *Evans* (1878), 61 Ind. 56; *Reed* v. *Coale*
(1853), 4 Ind. 283; 1 Jones, Mortgages (6th ed.) §457;
*Reeves* v. *Hayes* (1884), 95 Ind. 521.

The force of the latter case is affected somewhat by the
dissenting opinion of Niblack and Zollars, JJ., and by its
being doubted in *Citizens State Bank* v. *Julian* (1900),
153 Ind. 655, 55 N. E. 1007, though grounded on a somewhat
different question in each case. 2 Devlin, Deeds (3d ed.)
§630 and cases cited; Wade, Notice (2d ed.) §§188-190.

A different question may be presented by the entry book.
§3986 Burns 1908, §2951 R. S. 1881. The statutes then in
force did not provide what the force of the entry
6. book shall be, but it has been construed to be notice
of the time of recording, the names of the parties,
the description of the land, the date and existence, but not
the contents of the instrument. *Gilchrist* v. *Gough* (1878),
63 Ind. 576, 30 Am. Rep. 250. It has been held that if a
mortgage is spread upon the mortgage record and is prop-

erly indexed, there is constructive notice to a *bona fide* subsequent purchaser, though not entered upon the entry book or the general index, and that the entry book and the general index are not records, nor a part of them. *Nichol* v. *Henry* (1883), 89 Ind. 54. It was there held, and we think correctly, that the entry book and the indices are for the purpose of facilitating the examination of the records, but constitute no part of them. 1 Jones, Mortgages (6th ed.) §518. If the language "Book 3 pages 1 and 2" refers to the miscellaneous record, as the finding shows that the deed was recorded in the miscellaneous record, then clearly neither constitutes constructive notice of the contents of the deed. If it refers to a deed record, it could not be found there, and not being found anywhere in the deed records, which were the only ones required to be examined, the instrument could not, as hereafter shown, constitute constructive notice, for it was the duty of those interested in the property to see to it that it was properly recorded. 2 Devlin, Deeds (3d ed.) §630; *Gordon* v. *Constantine Hydraulic Co.* (1898), 117 Mich. 620, 76 N. W. 142; *Barnard* v. *Campau* (1874), 29 Mich. 162; Wade, Notice (2d ed.) §186; 1 Jones, Mortgages (6th ed.) §§515, 516.

An analogous holding is made in *Adams* v. *Buhler* (1892), 131 Ind. 66, 30 N. E. 883, on the question of the insufficiency of the record as giving notice, but under a special statute it is held that filing the notice of the mechanics' lien gives the notice required by the statute. It may seem that *Chandler* v. *Scott* (1890), 127 Ind. 226, 26 N. E. 797, 10 L. R. A. 374, is in conflict with *Nichol* v. *Henry, supra,* and *Gilchrist* v. *Gough, supra.* There seems, however, to be a distinction in reason. It must be clear that the entry book is not to give notice of the contents of an instrument, even if it could be held to impart such notice as to direct inquiry. If it can be said to direct inquiry as to the contents of an instrument, where would it be found? Certainly either from the original, or from the record, and it

has been held repeatedly that a purchaser need not look beyond the record, even though the record is incorrect. *Osborn* v. *Hocker* (1903), 160 Ind. 1, 66 N. E. 42; *State, ex rel.,* v. *Davis* (1884), 96 Ind. 539. And when the record is not in the chain of title, it is almost universally held that the record is not notice. But in *Chandler* v. *Scott, supra,* this court held a chattel mortgage valid, as against an innocent purchaser, which had been left for record at the recorder's office, and taken away by the mortgagee without notice that it had not been recorded. The opinion does not disclose, but the original record does, that the proper entry was made on the entry book in that case, and indorsement made on the instrument itself that it had been recorded. The statute in review in that case provided that the mortgage should "be considered as recorded from the time it shall be left at the proper recorder's office for that purpose." The statute before us provides that "every such deed or instrument shall be deemed as recorded at the time so noted" in the entry book. There is no real difference between the two sections, unless the former may be held to apply to chattel mortgages, as furnishing constructive possession, and is different in effect from the provision regarding instruments affecting real estate, and it is so held in *Gilchrist* v. *Gough, supra,* and *Chandler* v. *Scott, supra,* virtually holds that when an instrument is delivered to the recorder, all further responsibility or duty of the mortgagee to see and know that it is properly recorded ends, and he may rest in security. If that be unqualifiedly true, then the entry book must import some kind of constructive notice, beyond that held in the case of *Gilchrist* v. *Gough, supra,* and the two cases cited are erroneous, as, also, are all our cases holding that where the amount of a mortgage or the description is erroneously transcribed on the record, the mortgagee must stand the loss. What then does this statute mean? In Jones, Chattel Mortgages (5th ed.) §270, it is said: "A statutory provision that a mortgage 'shall be considered as

recorded when received' must be construed to mean that
a delivery and entry of the mortgage for record shall have
the same effect as the spreading of the instrument upon
the records, if subsequently in due course it be actually
spread on the records.'' This, it seems to us, is a fair con-
struction of our statute, the principal practical effect of
which, so far as the entry book is concerned, is to fix the
time of recording as between different conveyances, and not
as a record of the instruments themselves, though it was
differently held in *Kessler* v. *State* (1865), 24 Ind. 313,
where the broadest construction was given the statute, and
an entry book held constructive notice of an unrecorded
mortgage, but denied in *Gilchrist* v. *Gough, supra*. If the
instruments are to be deemed as recorded when filed, so
as to constitute notice by that fact, then the entry book is
immaterial, except as fixing the time, and that is the only
matter, purpose or effect which the statute attributes to it,
and that is its only materiality, unless the statute is given
a much broader construction than the courts have since
given it, with the possible exception of the case of *Chandler*
v. *Scott, supra*. We are forced to disapprove the latter
case, unless it is distinguishable as involving a chattel mort-
gage, or is distinguishable on the ground that the entry book
is of no force as notice. In our opinion, the only notice this
section of the statute was designed to present was that of
the time of filing, and that aside from that question, the
original instrument on file before recording, or the record
after recording, is the sole vehicle of notice. If this be
not so, then the entry book ought to constitute notice, and
be sufficient to put one on inquiry, and charge him with
all that an examination of all records which might affect
the title in anyway would disclose, and the fact that it is
settled that he need only look for records in the chain of
title, and in the records where instruments affecting titles
would be found, confirms us in the view that the original,
or the record itself, furnishes the notice, and not the entry

book, and under this construction all our cases are reconcilable, except *Kessler* v. *State, supra.*

Isaiah F. Libbey is found to have been a purchaser in good faith for value, before maturity of the Wicker note.

7. It is quite clear that Isaiah F. Libbey in the foreclosure proceedings, in order to cut off equities of redemption, need not look for claims outside the chain of title, further than a purchaser of the title or equity need, so that the deed from Proudfoot to Wright gave him no notice of that claim. *Stockwell* v. *State* (1884), 101 Ind. 1; *Hazlett* v. *Sinclair* (1881), 76 Ind. 488, 40 Am. Rep. 254; *Corbin* v. *Sullivan* (1874), 47 Ind. 356.

Wright stood in the position of one not in privity of title or estate to the chain of title, hence it was not necessary that he be made party.

8. It will be noted that by the trust deed to Washington Libbey, the trust was to terminate by limitation in six years, when the remaining property embraced in the trust was to be conveyed to the wife or widow of Joseph F. Sinclair, if she were then living, and as she was then living, the equitable title at least would, without the intervention of other conditions, have vested in her. Nothing would have remained to be done by the trustee but to make conveyance as the deed required, the limitations in which fixed the duration and termination of the trust. *Young* v. *Bradley* (1879), 101 U. S. 782, 25 L. Ed. 1044; 1 Perry, Trusts §351; 28 Am. and Eng. Ency. Law (2d ed.) 932, 933, 949; *Westcott* v. *Edmunds* (1871), 68 Pa. St. 34; *Chamberlain* v. *Maynes* (1897), 180 Pa. St. 39, 36 Atl. 410; *Bacon's Appeal* (1868), 57 Pa. St. 504; *Renziehausen* v. *Keyser* (1864), 48 Pa. St. 351; *Rife* v. *Geyer* (1868), 59 Pa. St. 393, 98 Am. Dec. 351; *Fox* v. *Storrs* (1883), 75 Ala. 265. But appellants are confronted with the fact that Isaiah F. Libbey, being a *bona fide* purchaser without notice, when he came to make statutory foreclosure was not chargeable with constructive notice of the Washing-

ton Libbey deed of trust, or of its provisions, and therefore was not bound, or required to make either the trustee or the *cestuis que trustent,* parties to the foreclosure, and, so far as the records were concerned, needed look no further than Susan W. Sinclair, unless the entry in the entry book constituted notice, and it seems that it did not. It is clear that recording in the miscellaneous record was not notice of the terms, or contents of the deed. A later statute in substance declares the same rule. §1150 Burns 1908, §1094 R. S. 1881.

Appellants however insist that the entry book was sufficient to put all parties dealing with the real estate on inquiry, and that they are chargeable with notice of what might reasonably be expected to be found. But if the entry book and indices are no part of the record, they would not put one on inquiry as to a miscellaneous record for a chain of title to real estate. The pages of the record as shown by the entry book could not be shown before a deed is recorded, and appellants' argument amounts to this: That by the statute "such deed or instrument shall be deemed as recorded at the time so noted", if no page were indicated, is sufficient to send the examiner to the files, the original itself, and if the matter so stood, we might have a different question, but when that stage is passed, and the page inserted in the entry book, but the deed in fact recorded in an unauthorized record, the entry book would either not direct to the miscellaneous record, or if it did, that record would not convey notice, and the deed was the same as if there were no record. We do not overlook the holdings in some states under very similar, if not undistinguishable statutes, but the rule here seems to be settled, and under these holdings it appears that neither the entry book nor the record of the Washington Libbey deed produced constructive notice, and that neither the trustee nor the *centuis que trustent* were necessary parties to transfer the title or bar the equity of redemption.

It is urged by appellants that as to many of the parties they were not *bona fide* purchasers without notice, while appellees insist that the trust deed to Bishop conveyed the title, and empowered him to make sale, either directly under the power, or indirectly through a judicial foreclosure, and that the latter, when made, operated precisely as a conveyance in execution of the power,

The rule is firmly settled in this State that any instrument which is executed for the purpose of securing a debt, is a mortgage. *Lowe* v. *Turpie* (1897), 147 Ind. 652, 677, 44 N. E. 25, 47 N. E. 150, 37 L. R. A. 233; *Fletcher* v. *Holmes* (1870), 32 Ind. 497; *Grable* v. *McCulloh* (1867), 27 Ind. 472; *Smith* v. *Brand* (1878), 64 Ind. 427; *Morton* v. *Noble* (1864), 22 Ind. 160; *Francis* v. *Porter* (1855), 7 Ind. 213; *Reasoner* v. *Edmundson* (1854), 5 Ind. 393. The common-law power in deeds of trust to secure the payment of a debt is based on the proposition that such an instrument at common law, conveyed the title, and that both the title and power run together, but it is likewise settled, in this State that the legal title is in the mortgagee; and while we recognize powers to sell as valid (§4029 Burns 1908, §2986 R. S. 1881), it is incompatible with our system, that a sale, whether under a foreclosure by judicial proceedings, or under the power, can bar the equity of redemption without notice. In form, the Bishop trust deed did convey the title, but on its face clearly shows that it was simply security for a debt, and was a mortgage. It was governed by the laws of this State as to the real estate in this State. *Nathan* v. *Lee* (1899), 152 Ind. 232, 52 N. E. 987, 43 L. R. A. 820; *Cochran* v. *Benton* (1890), 126 Ind. 58, 25 N. E. 870; *Swank* v. *Hufnagle* (1887), 111 Ind. 453, 12 N. E. 303, 13 N. E. 105. Except for its express provisions, it would not have conferred the right of possession. *Jewett* v. *Tomlinson* (1894), 137 Ind. 326, 36 N. E. 1106. But granting these proposi-

tions, and granting the further proposition that
8. the owner of the property, in order to be defeated
of his title, must be made a party to, and given
notice of the proceeding, which is the undoubted rule, it
does not follow that he is entitled to notice under all cir-
cumstances. Clearly he can have no better or higher right
against a prior mortgagee, a purchaser in good faith, than
he could have against a subsequent purchaser of the title
in good faith, without notice of his claim, where such pur-
chaser claims through a common grantor in a regular, re-
corded chain of title in the proper records, and he claims
through a deed recorded outside the statutory record, which
is the same thing in effect, as his holding under an unre-
corded deed, and he is no more entitled to be made party
in one case than in the other, in the absence of actual no-
tice to the holder of the lien:

Appellees contend that the Bishop trust deed transferred
the legal title, and when Isaiah F. Libbey became the owner
of the note, the title was transferred to him under
13. §4029 Burns 1908, §2986 R. S. 1881, and that the
foreclosure proceeding was a judicial proceeding, and
authorized Isaiah F. Libbey to transfer the legal title and
the equity of redemption, and that he did transfer them to
Donnersburger under §1135 Burns 1908, §1089 R. S. 1881,
under the holding in *Ferguson* v. *Boyd* (1907), 169 Ind.
537, 81 N. E. 71, 82 N. E. 1064, and *Eaton, etc., R. Co.* v.
*Hunt* (1863), 20 Ind. 457. It will be noted that §1135,
*supra,* was approved on May 4, 1852, and §4029, *supra,* was
approved on June 17, 1852, but both went into effect at the
same time—May 6, 1853, and in *Eaton, etc., R. Co.* v. *Hunt,
supra,* it was held that both sections may be enforced as
modified by the act of June 17, as cumulative remedies.

*Ferguson* v. *Boyd, supra,* is based on consideration of
equitable defenses, in the course of the presentation of
which, attention is directed to the distinction between de-

feasances in collateral agreements which operate to defeat a title which has vested and agreements to reconvey, though in each the grantee has the legal title, and it is there said, dealing with a question of title, quoting from 1 Jones, Mortgages (6th ed.) §244: ''An absolute deed with a defeasance passes the legal title to the property even in states in which it is held that a mortgage in the usual form does not pass the title.'' But it is clear that that rule does not obtain in this State, besides, in the same section, it is also said: ''At law, an absolute deed and a separate absolute defeasance or agreement to reconvey, executed at the same time, as security for a debt, amount to a mortgage.'' And such is the prevailing rule. See note 15, §244, *supra.* Nor is it material that the defeasance be separate; it may appear in the same instrument, and in such case, as a conclusion of law, it is a mortgage. *Jeffery* v. *Hursh* (1885), 58 Mich. 246, 25 N. W. 176, 27 N. W. 7; *Clark* v. *Landon* (1892), 90 Mich. 83, 51 N. W. 357; *Wilson* v. *Shoenberger's Exrs.* (1858), 31 Pa. St. 295; *Reitenbaugh* v. *Ludwick* (1858), 31 Pa. St. 131; *Waters* v. *Crabtree* (1890), 105 N. C. 394, 11 S. E. 240. The instrument in this case contains no defeasance, but discloses on its face that it is in trust for two purposes, viz., in default of payment of the note the right to take possession and recover the rents and profits, and to sell the property. While there is an agreement to reconvey, it is a common-law form, and taken all together, it is clear that it is a mortgage, pure and simple. On payment of the debt an indorsement of that fact on the record would have rendered the property discharged of that instrument, and free from any rights under it; certainly so in this State. It was therefore the foreclosure proceeding alone which conferred whatever right Isaiah F. Libbey had.

But it is insisted by appellants that none of the parties to the title can be regarded as *bona fide* purchasers. That contention is based on the force and

effect of the entry book, and the record of the deed in the miscellaneous record, and that question must determined against appellants.

Appellants by their separate fifth paragraph of cross-complaint sought to redeem from the mortgage debt, accompanying the cross-complaint with a tender of the amount admitted to be due. To this paragraph appellees pleaded the five, ten, fifteen and twenty-year statute of limitations, and appellants replied their nonresidence for more than twenty years before the commencement of the suit, contending that they are not execution debtors, nor claiming through any execution debtor in the foreclosure proceedings, or heirs of any execution debtor, and hence the statutes are not a bar, and complain that the court did not state conclusions of law on each of these issues, and we are quite in accord with the idea that such is the correct practice, except in cases where, on the facts found, the law is clearly with the party in whose favor the facts are found, and the rule cannot be too highly commended in the orderly administration of justice, in order that any specific question in issue may be presented on exception to the conclusions. *First Nat. Bank* v. *Arnold* (1901), 156 Ind. 487, 60 N. E. 134. It seems to us however, that appellants are in no situation to complain in that particular, for the reason that the findings of fact are very full, and the conclusions are sufficient if under any view of the facts and the law appellants cannot recover and appellees can.

Their right to redeem turns on the question whether they were bound by the foreclosure proceedings, and we think that must be answered in the affirmative: that is, that there being no deed of record, in a proper record, from Susan W. Sinclair, notice to her in the foreclosure proceedings is binding on those who claim through that deed. While it was clearly the duty of the mortgagee, in order to cut off the equity of redemption, to make parties those who had an interest, in the absence of actual notice, he

might rely on the proper records in the chain of title for the necessary information. He would not be bound to go further, or search differently than a purchaser of the fee or equity would, and when the latter traces the title to his grantor by the proper record, he will be protected, and the same thing must be true in determining who are necessary parties to an action to foreclose the equity of redemption. 2 Jones, Real Property §§1470, 1471. Joseph F. Sinclair was in equity the owner of one-half the property, up to the date of the Washington Libbey deed, and was the debtor, and the rights of appellants as his heirs, so far as the foreclosure and redemption are concerned, can rise no higher than his could have arisen under subd. 3, §295 Burns 1908, §293 R. S. 1881.

The claim was subsequently asserted against his estate and most certainly the *cestuis que trustent*, in legal effect must claim under Susan in his right, as to redemption, and not under the volunteer, Washington Libbey, and that section has been held to apply to sales under foreclosure proceedings. *Armstrong* v. *Hufty* (1901), 156 Ind. 606, 622, 55 N. E. 443, 60 N. E. 1080; *Moore* v. *Ross* (1894), 139 Ind. 200, 38 N. E. 817; *Sedwick* v. *Ritter* (1891), 128 Ind. 209, 27 N. E. 610; *Orr* v. *Owens* (1891), 128 Ind. 229, 27 N. E. 493.

It is settled also that as to actions to quiet title, fifteen years furnishes the bar. *Irey* v. *Markey* (1892), 132 Ind. 546, 32 N. E. 309; *Eve* v. *Louis* (1883), 91 Ind. 457; *Caress* v. *Foster* (1878), 62 Ind. 145.

Whether there has been open, notorious, exclusive, hostile, uninterrupted and adverse possession in Gunzenhauser, or his predecessors, for the necessary twenty years to operate as a bar, there has been constructive possession by virtue of the sheriff's deed to Isaiah F. Libbey, describing the whole property, which was recorded February 26, 1877, and which was in and of itself, at least notice to the world of the claim of title.

Appellees insist that the twenty-year statute of limitations applies to the question of adverse possession in Gunzenhauser, upon the theory that the statute continued to run until the summons issued upon appellants' cross-complaint was placed in the hands of the sheriff. It cannot be doubted that the acts of Gunzenhauser as found by the court, are amply sufficient to constitute adverse possession, if the necessary time had run. Gunzenhauser received his deed Dec. 24, 1887, went into possession in the spring of 1888, set markers and in 1889 began active improvement, and his acts have been those of notorious and hostile possession since. The application of appellant Cleveland to set aside the default, was filed March 2, 1908, and sustained March 4, 1908. The application of appellant Sinclair was filed May 5, 1908, and sustained May 5, 1908. The cross-complaint of appellant Cleveland was filed May 29, 1908, and summons was ordered. Appellant Sinclair's cross-complaint was filed September 8, 1908.

As Gunzenhauser was in possession under color of title, such occupancy as he asserted, would cover all the land within the description in his deed. *Moore* v. *Hinkle* (1898), 151 Ind. 343, 50 N. E. 822; *Worthley* v. *Burbanks* (1897), 146 Ind. 534, 45 N. E. 779. It may be true that against the running of the statute of limitations, the statute was not tolled until the cross-complaints were filed. *Dagow* v. *Neilson* (1858), 10 Ind. 183; *Hawthorne* v. *State, ex rel.* (1877), 57 Ind. 286; *Floyd* v. *Floyd* (1883), 90 Ind. 130; *Blake* v. *Minkner* (1894), 136 Ind. 418, 36 N. E. 246; *Raley* v. *Evansville Gas, etc., Co.* (1910), 45 Ind. App. 649, 90 N. E. 783, 91 N. E. 571. But we do not deem it necessary to determine that question. If the case depended upon that question, it would present a case where possession was taken for some purpose, for example, a survey beyond the twenty years, or the main assertion of title by possession within twenty years. But there is authority in this State for the application of the rule con-

tended for by appellees, that appellants' rights in any event were those of redemption alone, and that adverse possession of unproductive lands is shown by the recording of a deed under which the occupant claims, payment of the taxes and such acts of dominion as the character of the land invites, without proof of actual occupancy, and that possession under color of title need not be more than the exclusive dominion over it and that it is not necessary that it be cleared, fenced or buildings put upon it, and that the character of the land is of controlling influence in determining what acts of ownership, occupancy or use are adverse. *May* v. *Dobbins* (1906), 166 Ind. 331, 77 N. E. 353, and cases cited; *Mason* v. *Calumet Canal, etc., Co.* (1898), 150 Ind. 699, 50 N. E. 85; *Moore* v. *Hinkle, supra; Worthley* v. *Burbanks* (1897), 146 Ind. 534, 45 N. E. 779.

Under these cases it may be seriously questioned, whether adverse possession is not shown back to the recording of the Isaiah F. Libbey deed, and as confirming title in appellees, but in any event, the application of the doctrine of laches, in analogy to the statute of limitations, and especially in claims purely equitable, would bar appellants, and the fact of the enormous increase in value, is a strong factor in its application. 5 Pomeroy, Eq. Jurisp. (1 Eq. Rem.) §23 and notes.

It is urged however that appellants are within the provisions of §299 Burns 1908, §297 R. S. 1881, by reason of the fact of their nonresidence. This section does not apply to persons who are at all times nonresidents of the State, besides it applies by its express terms to defendants; that is, those against whom a cause of action exists. *Wood* v. *Bissel* (1886), 108 Ind. 229, 9 N. E. 425; *Royse* v. *Turnbaugh* (1889), 117 Ind. 539, 20 N. E. 485; *Mechanics Bldg. Assn.* v. *Whitacre* (1884), 92 Ind. 547; *Niblack* v. *Goodman* (1879), 67 Ind. 174.

Appellees pleaded the statute of Illinois, providing that in a deed of real estate to secure the payment of money, the

right to redeem the lands is barred in ten years after the maturity of the debt which the mortgage was given to secure. The Wicker note fell due March 28, 1874; it was a contract made in Illinois, between residents of that state, and it was enforceable under the laws of that state, except so far as the mortgage embraced real estate in Indiana, its enforcement must conform to our laws. But §299, *supra,* provides that when a cause of action has been fully barred by the law of the place where the defendant resides, it shall be barred here, the same as if it had arisen in this State and that the provision of the section shall apply only to causes of action arising without this State. The cause of action arose in Illinois, and for foreclosure in Indiana, but under that section it has been held, that where the statute is a bar in another state, it is a bar here. *Wright* v. *Johnson* (1873), 42 Ind. 29; *Van Dorn* v. *Bodley* (1871), 38 Ind. 402; *Harris* v. *Harris* (1871), 38 Ind. 423. And also, that if a person resides in another state until a cause of action is barred by its laws, he cannot be sued in this State on such cause of action. *Morrison* v. *Kendall* (1893), 6 Ind. App. 212, 33 N. E. 370; *Riser* v. *Snoddy* (1856), 7 Ind. 442, 65 Am. Dec. 740. It is apparent therefore, that after the expiration of ten years, there could have been no enforcement of the debt under the laws of Illinois; that such action was barred there; and as no statute applies to appellants as nonresidents, which affects their right to bring the action here, or relieved them from so doing, the action was barred here. True the redemption, could not have been exercised in Illinois at any time, but as the statute only comes to the aid of residents of this State, it cannot aid appellants, besides under our view, the right of redemption, by force of the effect of the judgment of foreclosure was restricted to one year.

In *Barr* v. *Vanalstine* (1889), 120 Ind. 590, 22 N. E. 965, it was held that the fifteen-year statute applies to an action for equitable redemption. This case was

followed in *Taylor* v. *Calvert* (1894), 138 Ind. 67, 37 N. E. 531, and *Turpie* v. *Lowe* (1902), 158 Ind. 314, 62 N. E. 484, 92 Am. St. 310, and seems to us to apply to this case as to the paragraphs of cross-complaint seeking to redeem, for the right to redeem in equity, accrued at the expiration of the year for statutory redemption. Under our views, however, the various statutes of limitations, domestic and foreign, the question of possession by a mortgagee or his grantees, the question of the right to maintain an action in ejectment, or any other possessory action, are immaterial, which arise if at all, under the cross-complaints, and are unconnected with the case made by appellees.

It is urged that some of the findings especially No. 35 on the question of laches, and No. 51 on the question of estoppel are but conclusions. The objections are not without force, but other findings in the case cover the questions if they are material, which they are not under our view.

Adverting again to the question of Gunzenhauser being a good faith purchaser, it is urged by appellants that the abstract of title presented to him, gave a substantial summary of the Washington Libbey trust deed, the foreclosure proceedings and the Proudfoot deed, and that the same abstract was examined by the Gary Land Company. It also showed a summary of the Proudfoot deed, as made by a stranger to the title, and also that he was a party to the foreclosure; and that the Libbey deed was not recorded in a record which imparted notice, and where constructive notice is relied on, it must be such notice as is required by statute to make it constructive. Hence the finding that the parties had such notice as the records imparted, was not a finding of actual notice, and falls far short of constructive notice, for the records did not legally impart constructive notice. *Corbin* v. *Sullivan, supra.* If the examiner put the construction upon the abstract which we think is the correct one, Gun-

zenhauser was correctly advised that the title was substantially good in Isaiah F. Libbey, and in reliance upon it he paid his money in good faith to twice the then value, without actual notice of any of the claims which are now set up, and expended nearly half as much more in improvements and neither the record nor the abstract furnished constructive notice.

As to the greater portion of the land, sale was made after the judgment quieting title in Gunzenhauser, so that under no consideration could that land be reached, by or in a proceeding consequent upon vacating that judgment, certainly, if as is found and we think the evidence shows, Gunzenhauser was himself a purchaser in good faith. *Stevens* v. *Reynolds* (1896), 143 Ind. 467, 41 N. E. 931, 52 Am. St. 422; *M'Cormick* v. *M'Clure* (1843), 6 Blackf. 466, 39 Am. Dec. 441; *Frakes* v. *Brown* (1830), 2 Blackf. 295; *Dunnington* v. *Elston* (1885), 101 Ind. 373. But even as to the land sold before the judgment quieting title, and the property yet in the name of Gunzenhauser, the latter must be regarded as the possessor of the legal title.

Much stress is laid by the able counsel for appellants upon the claim that Gunzenhauser being the plaintiff must recover upon the strength of his own title, and cannot interpose defects in appellants' title, arising by reason of defects of records, the statute of limitations, laches, etc. An examination of the record, shows that Gunzenhauser stood upon the legal title derived through the foreclosure proceedings, his lack of knowledge or notice of any defect, the payment of full value, the taking of possession and improvement under claim of title. The matters suggested by the appellants, all arose upon his defence to their cross-complaints in which they sought to quiet title, and in ejectment, and for redemption. Turning to the equities of the case, they are exceedingly strong in favor of appellees, and correspondingly weak as to appellants. From the day Joseph F. Sinclair invested in the land and for more

than twenty years thereafter, each successive transaction involved the payment of money at least equal to the value of the land. Gunzenhauser paid twice its value and it would not now be worth the amount he paid in 1887, except for the adventitious circumstance of the location of the great industries in the locality, and that appellants and their predecessors in claim, knew this, is beyond question, and they knew of the foreclosure proceedings, but doubtless regarded the property as worth no more than the debt, as it was not, and let such an unreasonable length of time intervene, that the situation of the parties has entirely been lost sight of, and the rights of innocent third parties have intervened, and upon the question of equitable right of redemption, they do not appeal to a court of equity, even if the foreclosure was invalid, for the delay is unaccountably unreasonable under the facts disclosed, and were we to determine the cause upon equitable grounds, or considerations, we should be forced to deny any relief to appellants.

Laches in the presentation of claims, is a well-recognized branch of equitable cognizance to prevent the enforcement of too long neglected rights; it does not grow out of mere lapse of time in any particular case, but out of the inequity of permitting those who know, or might by reasonable diligence acquaint themselves with the existence of the claims presented, to urge them, depending upon the equities of each particular case, and is especially applicable where the right is only an equity of redemption, and may be treated as in analogy to the statutes of limitation, or purely upon considerations of equity, and the discouragement of stale claims. We do not review the cases but cite a few which have invoked the doctrine. *Tevis* v. *Hammersmith* (1908), 170 Ind. 286, 295, 84 N. E. 337; *Ryason* v. *Dunten* (1905), 164 Ind. 85, 95, 73 N. E. 74, and cases cited; *Turpie* v. *Lowe, supra; East* v. *Peden* (1886), 108 Ind. 92, 94, 8 N. E. 722; *Richcreek* v. *Russell* (1904), 34 Ind. App. 217, 72 N. E. 617; *Vail* v. *Halton* (1860), 14 Ind. 344; *Patterson* v. *Hewitt*

(1904), 195 U. S. 309, 25 Sup. Ct. 35, 49 L. Ed. 214; *Moran* v. *Horsky* (1900), 178 U. S. 205, 20 Sup. Ct. 856, 44 L. Ed. 1038; *Halsted* v. *Grinnan* (1894), 152 U. S. 412, 14 Sup. Ct. 641, 38 L. Ed. 495; *Johnston* v. *Standard Mining Co.* (1893), 148 U S. 360, 13 Sup. Ct. 585, 37 L. Ed. 480; *Foster* v. *Mansfield, etc., R. Co.* (1892), 146 U. S. 88; 13 Sup. Ct. 28, 36 L. Ed. 899; *Galliher* v. *Cadwell* (1892), 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738; *Hammond* v. *Hopkins* (1892), 143 U. S. 224, 12 Sup. Ct. 418, 36 L. Ed. 134; *Underwood* v. *Dugan* (1891), 139 U. S. 380, 11 Sup. Ct. 618, 35 L. Ed. 197; *Hanner* v. *Moulton* (1891), 138 U. S. 486, 11 Sup Ct. 408, 34 L. Ed. 1032; *Landsdale* v. *Smith* (1882), 106 U. S. 391, 1 Sup. Ct. 350, 27 L. Ed. 219; *Wetzel* v. *Minnesota R., etc., Co.* (1894), 65 Fed. 23, 12 C. C. A. 490; *Walker* v. *Warner* (1899), 179 Ill. 16, 53 N. E. 594, 70 Am. St. 85; *Morse* v. *Seibold* (1893), 147 Ill. 318, 35 N. E. 369; *Woodruff* v. *Williams* (1905), 35 Colo. 28, 85 Pac. 90, 5 L. R. A. (N. S.) 986 and notes; *Capital Bank, etc.,* v. *Huntoon* (1886), 35 Kan. 577, 11 Pac. 369.

Some question is sought to be raised by the motion for a *venire de novo,* that the findings are defective, as stating conclusions, and that the conclusions do not find upon the separate issues. Conclusions in the findings will be, and are here disregarded, and so treated. The facts found are sufficient to support the conclusions, and the conclusions while general, cover all the issues in the case.

Complaint is made of the admission of alleged incompetent evidence, but we see no objection to the evidence objected to, besides it was cumulative. It is also claimed that certain of the findings are not supported by sufficient evidence. The explicit evidence coupled with such inferences of fact as the court was authorized to draw, we think authorizes all the findings, except such as may be conclusions, and with the latter disregarded, the findings are still supported by sufficient evidence, and the findings sufficient to support the conclusions and judgment.

We conclude that no error is made to appear by the record and the judgment is affirmed.

## On Petition for Rehearing.

Myers, C. J.—Three principal positions are taken by counsel, as to the original opinion.

(1) That the court was in error in holding that the conveyance by Dewey to Susan W. Sinclair was in legal effect a conveyance to Joseph F. Sinclair and Proudfoot, and in holding in that particular that §4024 Burns 1908, §2981 R. S. 1881, applied, and insisting that the conveyance falls within §§4017, 4019 Burns 1908, §§2974, 2976 R. S. 1881, because it was found that by oral agreement "Susan W. Sinclair was to take the title to said land in trust for Joseph F. Sinclair and the said William S. Proudfoot," and "that it was so taken without fraudulent intent to cheat, hinder, or delay the creditors of said Joseph F. Sinclair, or any other person whomsoever, and without any fraudulent intent whatever." The deed did not on its face disclose a holding by Susan W. Sinclair as trustee, nor that the title was held for the use or benefit of any other person.

It had been held in *Jackson* v. *Myers* (1889), 120 Ind. 504, 22 N. E. 90, 23 N. E. 86, and in the same case on a second appeal, *Myers* v. *Jackson* (1893), 135 Ind. 136, 34 N. E. 810, and in *Greenwood Bldg., etc., Assn.* v. *Stanton* (1902), 28 Ind. App. 548, 63 N. E. 574, that §4024, *supra,* applied where no trustee, or beneficiary, was named, and upon a more careful examination we conclude that they must each be disapproved upon that point. It is impossible that the statute can execute the use where a naked trustee is named, and no beneficiary is named, because it is impossible to discover the beneficiary therefrom. Such a deed might give notice of a holding not in the grantee's own right, but for an undisclosed beneficiary, but the statute cannot execute the use for lack of disclosure of the beneficiary. The

matter is best put by Cruise when he says in his Digest of
Real Property, "A trust therefore is a use not executed by
the statute of 27 Henry VIII." 1 Cruise, Real Property
458.

No one would seriously contend that a title held as here
disclosed, was not the subject of levy and sale as the prop-
erty of Sinclair and Proudfoot, or that its sale as the prop-
erty of Susan Sinclair could not have been enjoined. *Cox* v.
*Arnsmann* (1881), 76 Ind. 210; *Watkins* v. *Jones* (1867),
28 Ind. 12; *Glidewell* v. *Spaugh* (1866), 26 Ind. 319; *Cat-
terson* v. *Hall* (1906), 37 Ind. App. 341, 76 N. E. 889;
*Greenwood Bldg., etc., Assn.* v. *Stanton, supra.*

The legal effect is therefore the same in either case, that
the holding was wholly for the benefit of Joseph F. Sinclair
and William S. Proudfoot, under §4019, *supra*, and the orig-
inal opinion is as to that point so modified.

(2) That the court erred in holding that the record entry
book memoranda of the Libbey deed was not constructive
notice of its existence, sufficient to put all upon
6. inquiry as to the contents of the deed in the
miscellaneous record. It is urged in the brief
that the question was not raised on the original briefs,
and that appellants have had no opportunity to brief,
and argue that question. On oral argument the query
was suggested by the court as to the force of the entry
book memoranda, and was there argued by counsel, and they
were then granted time, and each filed extended briefs on
the subject, but not until the inquiry came from the court
to appellees, was there the slightest intimation from appel-
lants, that the entry book memorandum constituted con-
structive notice of the Libbey trust deed. The act does not
provide that the entry book, or mere registration consti-
tutes notice. Under the English and Irish Registry Acts, it
has been the rule of holding that the registry is intended to
give priority according to time of registration, but that reg-
istry does not of itself import, or constitute notice. *Ford*

v. *White* (1852), 16 Beav. 120; *Underwood* v. *Courtown* (1804), 2 Sch. & Lef. *41; *Doswell* v. *Buchanan's Exrs.* (1831), 3 Leigh 365, 23 Am. Dec. 280. This would clearly be true in cases under our laws where priority of record constitutes priority of title, or lien, and in the absence of a statute making it notice. The general rule in this country, and the acknowledged rule in this State is, that it is the record of the instrument which imports notice in the absence of a statute making the memoranda of entry, or the index, notice of the instrument. *Sowden & Co.* v. *Craig* (1868), 26 Iowa 156, 96 Am. Dec. 125; *Ely* v. *Wilcox* (1866), 20 Wis. *523, 91 Am. Dec. 436, and note; *Shepherd* v. *Burkhalter* (1853), 13 Ga. 443, 58 Am. Dec. 523 and note; *Davis* v. *Whitaker* (1894), 114 N. C. 279, 19 S. E. 699, 41 Am. St. 793 and note; *Koch* v. *West* (1902), 118 Iowa 468, 92 N. W. 663, 96 Am. St. 394 and notes; 2 Pomeroy, Eq. Jurisp. §665; 1 Jones, Mortgages 518, and cases cited.

The case of *Pringle* v. *Dunn* (1875), 37 Wis. 449, 19 Am. Rep. 772, goes as far in its reasoning, in supporting appellants' contention here, and farther than any case we have found, as to the force of the entry book entry, an index required by statute being involved in that case; but the decision is finally made to turn upon the question of the relation of the mortgage back to the index, as to the *time* when it was recorded. The fact that the mortgage was not entitled to record for lack of witnesses, as well as the index, were held not to give notice, which is in effect our holding by the original opinion, viz., that when a deed is recorded, that recording relates back to the entry book as to the question of priority in recording, but if the deed is not recorded in a proper record, or is not entitled to be recorded, so as to constitute notice, which is the usual holding, it certainly cannot be the law that recording in a record where deeds are not entitled to be recorded, can be of any greater efficacy than in the case put, and it is held without deviation in this State, that the record of an instrument not entitled to be

recorded, as for want of acknowledgment, is not notice for any purpose, at least where not actually seen of record; therefore, much less can the entry book be, and this is true, even though as between the parties the deed is good without acknowledgment, and there is no evidence, or finding, that Isaiah Libbey saw either the entry or record, but it is found that he was a purchaser, in good faith, without notice. *Walter* v. *Hartwig* (1886), 106 Ind. 123, 6 N. E. 5; *Westerman* v. *Foster* (1877), 57 Ind. 408; *Deming* v. *State* (1864), 23 Ind. 416; *Kothe* v. *Krag-Reynolds Co.* (1898), 20 Ind. App. 293, 50 N. E. 594; *Brown* v. *Budd* (1850), 2 Ind. *442; *Lambert* v. *Morgan* (1909), 110 Md. 1, 72 Atl. 407, 132 Am. St. 412, 17 Ann Cas. 439; note to *Middletown* v. *Newport Hospital* (1888), 1 L. R. A. 191, 192. And

5.   the same thing is true as to recording in the wrong record book, where by statute, filing for record is equivalent to actual recording, which is in effect our statute. *Durrence* v. *Northern Nat. Bank, etc.* (1903), 117 Ga. 385, 43 S. E. 726; *Sawyer* v. *Adams* (1836), 8 Vt. 172, 30 Am. Dec. 459; *Gillig* v. *Maass* (1863), 28 N. Y. 191; *New York Life Ins. Co.* v. *White* (1858), 17 N. Y. 469; *Knickerbocker Trust Co.* v. *Penn Cordage Co.* (1903), 65 N. J. Eq. 181, 55 Atl. 231; *Parsons* v. *Lent* (1881), 34 N. J. Eq. 67; *Fisher* v. *Tunnard* (1873), 25 La. Ann. 179; *Bernard* v. *Benson* (1910), 58 Wash. 191, 137 Am. St. 1051; *People, ex rel.,* v. *Burns* (1910), 161 Mich. 169, 125 N. W. 740, 137 Am. St. 466; *Grand Rapids' Nat. Bank* v. *Ford* (1906), 143 Mich. 402, 107 N. W. 76, 114 Am. St. 668, 8 Ann. Cas. 102; *Prouty* v. *Marshall* (1909), 225 Pa. St. 570, 74 Atl. 550, 25 L. R. A. (N. S.) 1211.

Our attention is directed to the cases of *Farabee* v. *Mc Kerrihan* (1896), 172 Pa. St. 234, 33 Atl. 583, 51 Am. St. 734; *Ivery* v. *Dawley* (1905), 50 Fla. 537, 39 South 498, 7 Ann. Cas. 354 and note; and *Swepson* v. *Exchange, etc., Bank* (1882), 77 Tenn. 713. In the first case, there is

a review of prior cases in that court, but the opinion is grounded on the fact that there was no law in Pennsylvania directing where different kinds of instruments should be recorded, and was an express statute that entry in the indices of recorded deeds and mortgages "shall be notice." In the Florida case, the opinion is grounded on the fact that prior to June 13, 1892, there was no statute directing where mortgages should be recorded, with little discussion on the subject, but the note to 7 Ann. Cases, *supra,* points out the distinction we have made. In the Tennessee case, the statute provided that the *registry* which corresponds to our entry, shall be notice to all the world from the time it is noted for record. It will at once be seen, that these cases can not apply to a case where there is no provision that the entry or registry for recording shall constitute notice, and where the statute prescribes where certain instruments shall be recorded.

It is now for the first time urged that being a deed of trust, the Washington Libbey deed is taken out of the category of conveyances required to be recorded in deed records, and therefore under the rule in *Tipton Fire Co.* v. *Barnheisel* (1883), 92 Ind. 88, it was proper to record it in the miscellaneous record. We should not be required under the rules to notice this claim, but we will do so. In the Barnheisel case, the question arose over an admission of evidence, and the language used with respect to the recording acts, is shown by the opinion not to have been necessary to the decision of the point, or the cause. It is the established rule in this state that the transfer of any interest in real estate should be recorded in the deed records. That where there is no statute requiring recording in a particular record, an instrument may be recorded in a miscellaneous or other record, or where the index or the entry by statute constitutes notice, such record will be sufficient, is held in the Pennsylvania,

Tennessee, and Florida cases cited, and in the cases in the note to 7 Ann. Cases, *supra*, but they do not reach the question before us.

(3) That the court was in error as to jurisdiction in the foreclosure proceedings as applied to this case, within the doctrine of *Galpin* v. *Page* (1873), 18 Wall. 350, 2. 21 L. Ed. 959, and some other cases cited, notably, *Fontaine* v. *Houston* (1877), 58 Ind. 316; *Pollard* v. *Wegener* (1861), 13 Wis. *569; *Adams* v. *Baldwin* (1892), 49 Kan. 781, 31 Pac. 681; *Johnson* v. *Hunter* (1906), 147 Fed. 133, 77 C. C. A. 359; *Brown* v. *St. Paul, etc., R. Co.* (1888), 38 Minn. 506, 38 N. W. 698; *Chase* v. *Kaynor* (1889), 78 Iowa 449, 43 N. W. 269. The specific point made is, that presumptions in support of judgments of superior courts of general jurisdiction, are limited to jurisdiction over persons within their territorial jurisdictions, who can be reached by their process, and over proceedings which are according to the course of the common law.

As we held originally, and hold now, that no notice of the Libbey trust deed was given by the public records, and the finding is that Isaiah Libbey was a purchaser in good faith, that is, without notice, and Susan W. Sinclair was a party, and served with notice, the jurisdictional question may be said to be narrowed to the question of the presumptions, if any, to be indulged in case of service out of the State. True it is said in *Galpin* v. *Page, supra,* following the quotation originally made, "They (presumptions) have no place for consideration where the evidence is disclosed, or the averment is made. When, therefore, the record states the evidence, or makes an averment with reference to a jurisdictional fact, it will be understood to speak the truth on that point, and it will not be presumed that there was other or different evidence respecting the fact, or that the fact was otherwise stated."

The case at bar as we conceive it, falls squarely within the rule. The record is entirely silent as to whether there

was an affidavit of nonresidence, or whether under the statute of Illinois a notary public was authorized to administer oaths, and the court finds that the persons named, "have been duly served with summons out of the state," and we know judicially that when the complaint was filed in the foreclosure proceedings, April 10, 1875, and when the summons issued, July 14, 1875, and when it was served, July 20, 1875, the Lake Circuit Court was not in session, and under the statute, no order of court for publication, or service of summons outside the State was necessary.

In *Pollard* v. *Wegener, supra,* the case shows that the summons was not served in the manner required by the statute, and it was offered to be shown that service was not made in any form required by the statute.

In *Adams* v. *Baldwin, supra,* it is affirmatively shown that no affidavit was filed. The same thing is true as to *Johnson* v. *Hunter, supra.* In *Brown* v. *St. Paul, etc., R. Co., supra,* following *Barber* v. *Morris* (1887), 37 Minn. 194, 33 N. W. 559, 5 Am. St. 836, in each case the affidavit is affirmatively shown not to have been filed in advance of the publication. In *Chase* v. *Kaynor, supra,* it is shown that no affidavit was filed. In the case of *Galpin* v. *Page, supra,* it is shown that the statute required an order of the court, in order to authorize publication or its equivalent service out of the state, and the publication was "without judicial authority or sanction." It is true that the record was silent as to whether an affidavit had been filed, and in that respect the case is similar to the case at bar, but the cause went to the Supreme Court of the United States upon the express adjudication of the appellate court, that it was found affirmatively that no service of the summons was ever made, which of itself distinguishes this case. In *Fontaine* v. *Houston, supra,* the affidavit was in the record showing on its face an utter failure to comply with the statute, and to the same effect is *Eel River R. Co.* v. *State,*

*ex rel.* (1896), 143 Ind. 231, 42 N. E. 617, where the character of the service was shown. The doctrine of *Evansville Ice, etc., Co.* v. *Winsor* (1897), 148 Ind. 682, 48 N. E. 592, quoted in the original opinion, has been repeatedly reasserted. *Ryan* v. *Rhodes* (1906), 167 Ind. 121, 76 N. E. 249, 78 N. E. 330; *Taylor* v. *Strayer* (1906), 167 Ind. 23, 78 N. E. 236, 119 Am. St. 469; *Whittenberger* v. *Bower* (1902), 158 Ind. 673, 63 N. E. 307; *Bruce* v. *Osgood* (1899), 154 Ind. 375, 56 N. E. 25; *Driver* v. *Driver* (1899), 153 Ind. 88, 54 N. E. 389. In the latter case, it is said, "where jurisdiction of a court of general jurisdiction depends upon the finding of certain facts, that the exercise of jurisdiction implies the finding of those facts, but that such implication does not arise where there is an affirmative showing of all the facts or evidence upon which the action is taken," which is in exact harmony with *Galpin* v. *Page, supra,* and our former holding. For later cases in California, and Iowa as to the recitals in judgments of courts of general jurisdiction, and presumptions which arise upon collateral attack, see: *Sharp* v. *Lumley* (1868), 34 Cal. 611; *Sharp* v. *Brunnings* (1868), 35 Cal. 528; *Quivey* v. *Porter* (1869), 37 Cal. 458; *Quivey* v. *Baker* (1869), 37 Cal. 465; *In re Davis' Estate* (1906), 151 Cal. 318, 86 Pac. 183, 121 Am. St. 105; *Reily* v. *Lancaster* (1870), 39 Cal. 354; *Aultman* v. *McLean* (1869), 27 Iowa 129; *Ostby* v. *Secor* (1903), 94 N. W. (Iowa) 571. And the great weight of authority not only in this State but elsewhere is as declared in the original opinion. See collection of cases, titles, "Judgment," Century Dig. §§937-939, Decennial Dig. §§497-499.

Some criticism is made as to the application of subd. 3 §295 Burns 1908, §293 R. S. 1881, which was not made as plain to convey the court's idea and meaning as was intended, and we have made our ideas more definite by modification.

Objection is also made to our application of §299 Burns 1908, §297 R. S. 1881. We pointed out in the original opin-

Sinclair *v.* Gunzenhauser—179 Ind. 78.

ion the immateriality of the various statutes of limitation, but in addition to what was said, no error was assigned, or presented in any way, as to the ruling on the demurrers to the answers of the statute of limitations, and it is pointed out that there was no reply of nonresidence of Gunzenhauser to the answers of the statute of limitations, to the cross-complaints, and no issue of law or fact was presented as to that question.

It is also urged that no title is shown in Gunzenhauser. Counsel are in error. The findings and the evidence deraign title in him by regular chain from one in possession, as the common source of title, through the foreclosure proceedings.

The court is still satisfied as to the correctness of its conclusions in the original opinion, as modified, and the petition for a rehearing is overruled.

NOTE.—Reported in 98 N. E. 37, 100 N. E. 376. See, also, under (1) 8 Cyc. 1083; (2, 9) 23 Cyc. 1078; (3) 39 Cyc. 234; (4, 5) 39 Cyc. 1728; (7) 27 Cyc. 1562; (10) 27 Cyc. 1466, 1689; (11) 27 Cyc. 974; (12) 27 Cyc. 975; (14) 39 Cyc. 1725; (15) 38 Cyc. 1978; (16) 25 Cyc. 1030; (19) 1 Cyc. 1125; (20) 27 Cyc. 1820; (21) 25 Cyc. 1229; (22) 25 Cyc. 1022; (25) 39 Cyc. 1703; (26) 23 Cyc. 901; (27) 39 Cyc. 121; (30) 16 Cyc. 911. As to the doctrine of resulting trusts, see 51 Am. Dec. 751; 127 Am. St. 252. As to the effect of the defective recording of instruments upon the rights of third persons, see 96 Am. St. 397. On the question whether a deed absolute on its face but intended as a mortgage, conveys the legal title, see 11 L. R. A. (N. S.) 209. As to the law governing covenant in deed or mortgage of real property, see 17 L. R. A. (N. S.) 1094. For a discussion of the record of an instrument out of the line of title as constructive notice, see 18 Ann. Cas. 13.